**MILGRAM et al. v. LOEW'S, Inc. et al.**
**(Hamilton Street Realty Company, Intervenors).**

Nos. 10439, 10440 and 10441.

United States Court of Appeals Third Circuit.

Argued June 19, 1951.

Filed Oct. 31, 1951.

Rehearing Denied Dec. 18, 1951.

Hastie, J., dissented.

Bernard G. Segal and Morris Wolf, Philadelphia, Pa. (Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Wm. A. Schnader, J. Pennington Straus, Philadelphia, Pa., Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., Abraham L. Freedman, Philadelphia, Pa., Milton Handler, New York City, on the brief), for Loew's, Inc., and others.

William A. Gray, Philadelphia, Pa. (Gray, Anderson, Schaffer & Rome, Philadelphia, Pa., on the brief), for Hamilton St. Ry. Co., and others.

Albert M. Cohen, Philadelphia, Pa. (Cohen & Cohen, and Sylvan M. Cohen, Irving I. Specter, on the brief), Philadelphia, Pa., on the brief), for Milgram and others.

Before BIGGS, Chief Judge, and STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

Plaintiff, a partnership, owns and operates a newly constructed drive-in theater in Allentown, Pennsylvania. It commenced this action against the eight major distributors [1] of feature motion pictures, alleging that they had conspired to refuse to license features on the first run to plaintiff's drive-in. The case was tried to the court. The district judge found that the uniform refusal of all eight distributors to license first run films to plaintiff was the result of concerted action. This was held to be an unreasonable restraint of trade in violation of the anti-trust laws, whereupon a decree was entered requiring the distributor-defendants to give plaintiff an equal opportunity with the operators of conventional theaters to bid for pictures on first run. From that decree the distributors have appealed. Several exhibitors who operate first run theaters in downtown Allentown and Bethlehem were allowed to intervene; they too have appealed from the decree entered below. Plaintiff has moved to dismiss the appeal of these intervening defendants, and this motion is also before us. The district court refused to enter an order allowing plaintiff an attorney's fee as a part of its costs, and plaintiff has taken an appeal.

The salient facts found by the district court are as follows: Plaintiff's theater, known as the Boulevard Drive-In, is located on a major highway leading from the center of Allentown to Bethlehem. It is within the city limits of Allentown— 2.4 miles from the business center of that city, 1.7 miles from the common boundary between Allentown and Bethlehem, and less than five miles from the business center of Bethlehem. The Boulevard was constructed in 1949 at a total land and building cost of nearly $260,000. It accommodates over 900 cars, with an estimated capacity of 2500 adult patrons. The opinion of the trial judge was that in equipment, appointments and conveniences, Boulevard Drive-In is one of the finest drive-in theaters in the country and that if any drive-in be suitable for the showing of first run features, certainly this one is. David Milgram, the managing partner and an experienced operator, has been conducting the theater "along lines consistent with the highest grade of moving picture entertainment."

Plaintiff opened Boulevard Drive-In on October 19, 1949. It was operated for about five weeks as a "dress rehearsal," during which time it showed only old pic-

---

[1]. The eight distributor-defendants are: Loew's, Inc., Paramount Film Distributing Corporation, R.K.O. Radio Pictures, Inc., Twentieth Century-Fox Film Corporation, United Artists Corporation, Universal Film Exchanges, Inc., Columbia Pictures Corporation, Warner Brothers Pictures Distributing Corporation. The court found that approximately 85% of all first-class feature films produced in the United States are distributed by the eight distributor-defendants. Paramount, R.K.O., Twentieth Century-Fox, Warner Bros., and Loew's will be referred to collectively as the "Big Five" or as the "major distributors" because they were also engaged in the exhibition phase of the industry. See footnote 8, infra. Columbia, Universal, and United Artists will be referred to as the "minor defendants."

tures. Plaintiff planned, however, that when the Boulevard reopened the following spring, it would be with first run films. During the fall of 1949, David Milgram spoke with the salesmen and district managers of many of the defendants, requesting features on first run when Boulevard Drive-In reopened in the spring. In November, 1949, plaintiff's attorney sent registered letters to each of the distributor-defendants, wherein he formally requested features on first run for plaintiff's theater. Some of the distributors failed to reply; others replied with inconclusive answers. There is no doubt, however, that each distributor decided not to license features on first run to the Boulevard. Moreover, six of the distributors (the Big Five and Universal) have now offered plaintiff a run 28 days after first run. The district managers of each of the distributors testified that their companies would not license first run features to the Boulevard even should plaintiff offer to pay a rental in excess of that offered by one of the downtown Allentown theaters. Each asserted that his company had arrived at this decision independently and had made no agreement with any other distributor. In fact, each stated he had no knowledge that any other distributor had refused to license first runs to the Boulevard.

The district managers testified with respect to the business reasons which prompted their companies to adopt this policy. Aside from minor variations, these reasons are essentially the same. They fall into two categories. First, the distributors declared that the drawing power of a conventional downtown theater is superior to that of a drive-in. The importance of the "drop-in" trade in the downtown area was stressed. The conventional theater has afternoon and early evening performances, whereas the drive-in is naturally limited to hours of darkness. Emphasis was placed on Saturday matinees for children. In this area a drive-in is a seasonal enterprise limited to seven or eight months, only several of which are so-called peak months. The distributors agreed that drive-in theaters are more susceptible to the whims of the weather. And it can hardly be denied that the drive-in's appeal is limited to those who have the use of an automobile.

Secondly, the distributors testified that the showing of a feature on first run at a drive-in would reduce the income derived from subsequent runs. They asserted that first run showings are, in a sense, show cases for subsequent runs, in that the first run showing at a downtown theater gives a picture prestige which is important in "establishing" it in the neighboring area. Further, they emphasized the advertising value of a central city marquee.

The trial judge found that the Boulevard was in substantial competition with theatres in both Allentown and Bethlehem. In downtown Allentown, first run features are shown in seven theaters,[2] one of which also plays features on a subsequent run. First run features are shown in four theaters in Bethlehem.

It should be noted that none of the distributor-defendants has a financial interest in any of the first run theaters in Allentown or Bethlehem.[3] Three of these Allentown theaters are operated by intervening defendant Hamilton Street Realty Company. Hamilton is affiliated with the Fabian interests, which operate a total of sixty theaters in the eastern part of the United States.

The trial court found that each distributor adopted and adhered to the uniform course of excluding plaintiff from competing for first runs and that each acted with knowledge that all the others were so doing. Testimony to the effect that each

2. The largest of the first run theaters in downtown Allentown is the Colonial, with a seating capacity of approximately 1800. The other six accommodate approximately 1700, 1400, 1000, 900, 865, and 800, respectively.

3. Intervening defendant Embassy Corporation of Allentown operates two first run theaters in Allentown and two in Bethlehem. Intervening defendants Max Korr and Leon Korr operate one first run theater in Allentown while the fourth intervenor, College Theatre Amusement Co., operates one theater in Bethlehem.

proceeded in ignorance of the others was termed by the district judge incredible. Weighing this evidence of consciously parallel practices on the part of the distributors in the factual context of this case, the trial court concluded that a finding of a conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, was warranted.

■■ The distributor-defendants argue on appeal that the evidence is insufficient to justify an inference of agreement among them. But in this modern era of increasing subtleties, it is rare indeed for a conspiracy to be proved by direct evidence.[4] There is no dispute over the proposition that circumstantial evidence will sustain a finding of conspiracy. An experienced trial judge has heard the evidence and passed upon the credibility of the witnesses in this case; his conclusion is that an inference of joint action on the part of the distributors is warranted. The sole question now before us on this appeal is whether the trial judge's findings of fact are clearly erroneous. See Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.

■ Our starting point in analyzing the evidence is the complete unanimity with which all the distributors refused to license features on first run to plaintiff and the substantial unanimity with which they gave the Boulevard a 28 day status. Further, each distributor acted with knowledge of the policies of his competitors. It is clear that the reasons advanced by the distributors were not reasons peculiarly applicable to the Boulevard Drive-In or to Allentown, but were, with a few exceptions,[5] applicable to all drive-in theaters. The district court properly concluded that the district managers were putting into effect in Allentown a general program adopted and adhered to by the directing heads of each distributor to relegate drive-ins to second run status. This uniformity in policy forms the basis of an inference of joint action. This does not mean, however, that in every case mere consciously parallel business practices are sufficient evidence, in themselves, from which a court may infer concerted action. Here we add that each distributor refuses to license features on first run to a drive-in even if a higher rental is offered. Each distributor has thus acted in apparent contradiction to its own self-interest. This strengthens considerably the inference of conspiracy, for the conduct of the distributors is, in the absence of a valid explanation, inconsistent with decisions independently arrived at.

We think the evidence in this case can be profitably viewed against the background of United States v. Paramount Pictures, D.C.N.Y.1946, 66 F.Supp. 323. The evidence the government relied on there to prove a conspiracy to fix minimum admission prices and establish uniform clearances and runs was essentially consciously parallel business practices. The district court, 66 F.Supp. 341–346, concluded that the distributors, the same defendants now before this court, had acted in concert in granting clearances and runs. The Su-

4. The distributor-defendants have cited Westway Theatre v. Twentieth Century-Fox Film Corp., D.C.1940, 30 F.Supp. 830, affirmed 4 Cir., 1940, 113 F.2d 932, and Fifth & Walnut, Inc., v. Loew's, Inc., 2 Cir., 1949, 176 F.2d 587, certiorari denied, 1949, 338 U.S. 894, 70 S.Ct. 242, 94 L.Ed. 549. In the former case, there was a finding by the judge of no conspiracy. In the latter, the same issue was submitted to a jury, which returned a verdict for the defendants distributors. Thus, in each case the Court of Appeals merely affirmed the finding below. This was particularly stressed in the opinion of the Court of Appeals for the Second Circuit in Fifth & Walnut, Inc., v. Loew's, Inc., supra. For example, in speaking of a move-over arrangement there, the court stated, 176 F.2d p. 591: "This is not to say that the jury could not have found, particularly against the background of the motion picture industry as it is now known, that the move-over arrangement was part of such a conspiracy. But the jury did not so find, and the alternative which they chose was properly offered to them in the court's charge." See also Bordonaro Bros. Theatres v. Paramount Pictures, 2 Cir., 1949, 176 F.2d 594, where a finding of conspiracy was affirmed.

5. The reasons relating to weather and climate would, of course, be less applicable in the South and in southern California.

preme Court, in affirming this finding, declared, 334 U.S. 131, 146–147, 68 S.Ct. 915, 924, 92 L.Ed. 1260: "The evidence is ample to support the finding of the District Court that the defendants either participated in evolving this uniform system of clearances or acquiesced in it and so furthered its existence."

The past proclivity of these defendants to unlawful conduct has been alluded to both by the Supreme Court in the Paramount case, 334 U.S. at page 147, 68 S. Ct. at page 924, and by this court in Ball v. Paramount Pictures, 3 Cir., 1948, 169 F.2d 317, 320. It is true that the facts of the instant case arose subsequent to the time period involved in the Paramount case. They arose soon after the Paramount decision, and before any decree had been entered there against most of the distributor-defendants.[6] We think that the past proclivity of these defendants to unlawful conduct may be of some significance here, where the conspiracy alleged by plaintiff is identical in scope and nature to one of the conspiracies found in the Paramount case—concerted action to fix a uniform system of runs and clearances. The similarity of the conspiracy found in the case at bar and the nationwide conspiracy considered in the Paramount case is striking. On remand, the district court in the Paramount case observed that in smaller communities there was either a total absence of or slight competition from drive-ins. D.C.N.Y.1949, 85 F.Supp. 881, 894. This evidence the district court termed significant additional proof of monopoly control by the five major distributors of the first run theater market. Though that court did not mention the status of drive-ins in larger cities, the evidence presented in the case at bar makes it clear that the policy of the eight distributors, at least in the Philadelphia exchange area,[7] does not differentiate between smaller and larger communities. Further, there is no evidence that this policy was conceived subsequent to the time period involved in the Paramount case. Viewing the facts of this case in the light of the specific finding in the Paramount case, the inference of conspiracy here is strengthened.

We think that the district court's inference of a concerted action was warranted under the rules laid down by the Supreme Court in the Paramount case and in Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. The decisions of this court are in full accord. William Goldman Theatres v. Loew's Inc., 3 Cir., 1945, 150 F.2d 738, and Ball v. Paramount Pictures, supra. The Goldman case is particularly apposite. There the distributors, the identical ones now before this court, had uniformly refused to license pictures on first run to the plaintiff's Erlanger Theatre, which the trial court had found suitable for the showing of first run features in Philadelphia. In reversing the judgment of the district court, which had held that no conspiracy had been established, we stated, 150 F.2d at page 745: "Uniform participation by competitors in a particular system of doing business where each is aware of the other's activities, the effect of which is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the statutes before us."

We also stated in the Goldman case that the burden fell on the defendants to explain away the inference of joint action. In that case there was a complete failure to shoulder that burden, in that none of the officers who had responsibility to act for the distributors were called to testify. Here the distributor-defendants have attempted to meet this burden. But we cannot stress too strongly that the credibility of those witnesses was a matter peculiarly within the province of the trial judge. Rule 52, Federal Rules of Civil Procedure. See dissenting opinion of Judge Goodrich in Ball v. Paramount Pictures, 169 F.2d, at pages 321–322.

The district court in the instant case no doubt concluded that the reasons advanced by the distributors were not the real ones

6. See Footnote 8, infra.

7. The Philadelphia Exchange area of all the distributors includes eastern Pennsylvania, southern New Jersey, and parts of Delaware, including Wilmington.

prompting their action, or, at least, that the distributors' policies were not arrived at independently. It may be noted that there was a conflict between the testimony of Milgram and that of many of the district managers and salesmen with respect to Milgram's alleged requests for first run features. Milgram had testified concerning conversations which the distributors' witnesses in many cases denied. As the trial judge concluded that Milgram's testimony was more accurate, it is implicit that the credibility of defendants' witnesses was damaged in his eyes. We have already noted that the district court had termed incredible the distributors' testimony that each acted in ignorance of the others. The trial judge was also influenced by the fact that opinions of each distributor were based on mere conjecture, for none had ever experimented in licensing features on first run to a drive-in. We need hardly say that businessmen are not guilty of conspiracy because a court finds their business reasons poor ones. Yet the district judge was justified in giving some weight to the fact that experienced officials of all eight distributors had made important policy decisions without engaging in any serious attempt to test their validity. At least some of the business reasons uniformly advanced by all the distributors were not strictly relevant. The fact that a downtown theater is accessible to "drop-in" trade, has matinees, and attracts children on Saturdays is beside the point so long as plaintiff offers a guarantee which sufficiently protects the distributors. We must start with the premise that plaintiff has offered to pay a guaranteed rental in excess of the probable total rental to be paid by a downtown theater. If the drawing power of the conventional downtown theater is so superior to its open air cousin that plaintiff could not continue to offer larger rentals, then the competitive forces of our economy would effectively dispose of plaintiff's bids for first runs. It is implicit in the opinion of the district court that at least some of the explanations offered by the distributor-defendants

for their actions were invalid. The voicing of the same invalid reasons for identical equivocal actions is of itself sufficient from which to infer guilt.

The distributor-defendants urge strenuously that the Goldman case is not controlling here, as that case dealt with a monopoly situation. In that case one of the distributors, Warner Brothers, operated all the first run theaters in Philadelphia, whereas in the instant case none of the distributors has any financial interest in the theaters in Allentown or Bethlehem. We do not think, however, that the difference in the factual setting substantially lessens the weight we should accord the Goldman decision. The key question in that case was whether the uniform action of all distributors in not licensing pictures on first run to Goldman was the result of a conspiracy. Admittedly, Warner Brothers would have had an excellent motive for desiring such joint action. Why the other distributors desired such action is not quite so obvious, but becomes so if viewed against the facts of the motion picture industry brought to light in the Paramount litigation. In 1945 the Big Five distributors dominated the first run theater market in the 92 largest cities of the nation. 85 F.Supp. 881, 894. Thus, each of the major distributors, by favoring Warner Brothers in Philadelphia, might expect reciprocal favored treatment in other cities where it, in turn, dominated the first run theater market. This was apparently the motive for conspiracy in the Goldman case, and no doubt aided the court in drawing such inference. The motive in the instant case is similar. The trial judge found that the denial of first runs to plaintiff was the result of a nationwide policy of all the distributors—a nationwide policy to relegate drive-ins to second run status. We have no doubt that the five major distributors, with large investments in first run, conventional theaters throughout the country, may have been fearful of the competition of this new medium of exhibition—the drive-in theater.[8] Their common apprehension readily

8. On remand, the district court in the Paramount case decided that the proper remedy should be a divorcement of the business of the major defendants as exhibi-

explains the unanimity with which they refused first runs to plaintiff and the unanimity with which they accorded it second run status. Had Boulevard been given films on first run, first-class drive-ins throughout the country would have demanded similar treatment. Hence, the fact that none of the distributors operates a theater in Allentown is of little significance. The denial of first runs to the Boulevard, a purely local situation, was thus merely a condition resulting from the nationwide policy. The real motive for the conspiracy here is thus strikingly similar to that in the Goldman situation. The motive of the minor defendants, as in the Goldman case, may not have been as strong, but it is apparent that they acquiesced in the policy.

■ Our study of the evidence in this case has convinced us that the trial judge's finding of a conspiracy in violation of Section 1 of the Sherman Act is adequately supported by the record.

■ The second question before us is the motion of plaintiff to dismiss the appeal of the intervening defendants. The district court found no unlawful conduct on their part, and as to them, dismissed the complaint without costs. The sole problem for our consideration is whether these intervenors have been legally aggrieved in any way by the decree entered below. It is settled law that even a party cannot appeal from a decision which is not adverse to him. Stearns-Rogers Mfg. Co. v. Brown, 8 Cir., 1902, 114 F. 939; Atles v. United States, 3 Cir., 1931, 50 F.2d 808, 78 A.L.R. 435. The decree of the district court was not directed at the intervening defendants. Where an injunction is granted, one cannot generally appeal from the order unless he is directly or indirectly restrained from the performance of some act. See 4 C.J.S., Appeal and Error, § 183. The intervening defendants contend, however, that the decree adversely affects them because it will result in the admission of plaintiff's theater to a first run status in competition with them.

■ It may very well be that the effect of the decree will be to injure the intervenors economically. But they can hardly contend that they have a legal right to be free from competition. The injury from competition is generally *damnum absque injuria*. Prior to the entry of the district court's decree, each of the distributor-defendants would have been free to license films on first run to plaintiff, and no legally protected interest of the other first run exhibitors would have been invaded. We cannot discern how the intervenors have now acquired greater rights merely because the distributor-defendants here have combined not to license first runs to plaintiff, and have now been enjoined from so doing. We think plaintiff's motion to dismiss the appeal of the intervening defendants should be granted.

Plaintiff's appeal from the district court's refusal to allow it an attorney's fee we deem without merit. Plaintiff seeks equitable relief only; hence the scope of its remedy is defined and necessarily limited by Section 16 of the Clayton Act, 15 U.S.C.A. § 26. Section 16, unlike Section 4, 15 U.S.C.A. § 15, makes no provision for the allowance of an attorney's

tors from their business as producers and distributors. The court, in its opinion, declared that vertical integration furnished the incentive for carrying out the conspiracy. 85 F.Supp. 881, 895–896. On November 8, 1948, a consent decree was entered as to R.K.O. It provided for the divorcement of R.K.O.'s theater assets from other assets. See C.C.H. Trade Reg.Rep., Par. 62,335. Two independent corporations were to be formed for that purpose. A similar consent decree was entered as to Paramount on March 3, 1949. C.C.H. Trade Reg.Rep., Par. 62,377. A final decree was entered as to Warner Brothers, Loew's and Twentieth Century-Fox on February 8, 1950, C.C.H. Trade Reg.Rep., Par. 62,-573. This decree was essentially the same as the consent decrees entered against R.K.O. and Paramount. The Supreme Court affirmed on June 5, 1950, United States v. Loew's, Inc., 339 U.S. 974, 70 S.Ct. 1031, 94 L.Ed. 1380.

In 1951, consent judgments were entered against Warner Brothers and Twentieth Century-Fox and were substituted for the earlier decrees. See C.C.H. Trade Reg.Rep., Pars. 62,765, 62,861.

fee to the successful plaintiff. See Decorative Stone Co. v. Building Trades Council, 2 Cir., 1928, 23 F.2d 426, 428; Alden-Rochelle, Inc., v. American Society of Composers, Authors and Publishers, D.C.N.Y. 1948, 80 F.Supp. 888, 899. The district court very properly refused to enter the requested order.

The decree of the district court (Nos. 10,439 and 10,440) will be affirmed. The appeal of the intervening defendants (No. 10,441) will be dismissed.

HASTIE, Circuit Judge (dissenting).

Believing that findings of the trial court, essential to its decision in appeal No. 10439, are clearly wrong, I think its judgment should be reversed. Moreover, I think that in applying the law to the facts, the district court proceeded on an erroneous conception of the relationship among alleged conspirators which must be proved to establish a combination in violation of the antitrust laws.

I

It was the district court's ultimate and decisive finding of fact that the defendant motion picture distributors were "putting into effect in Allentown a general program adopted and adhered to by the directing heads of the industry to relegate drive-in theatres generally to a second-run status." [1] The court explicitly predicated this finding upon the testimony of the eight district managers who represented the defendants in the Allentown area and the approval of their views in affidavits executed by responsible national officers of the defendants and admitted into evidence by stipulation. The items in the testimony of the area managers which the district court and this court considered suggestive of a nation wide conspiracy have not been specified. Therefore, no more can usefully be said here than that to me the entire testimony of the district managers can reasonably be construed only as statements of views and conclusions limited to the Allentown area and the undesirability of first run exhibitions by a drive-in theatre in that area. In some of the testimony this limitation was plainly stated. Elsewhere it was implicit. Whether the same considerations would be applicable and controlling elsewhere these witnesses were not competent to say and did not purport to say.

I think the key to the district court's reasoning about the significance of this testimony is to be found in its stated opinion that "it is highly important" that affidavits of top sales executives of the several distributors confirmed the reasoning and decisions of the area managers. But in my view this confirmation means only that the defendants remembered the decision of the Supreme Court against them in Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. There, in a motion picture conspiracy case concerning decisions local to the southwestern area, the Court indicated that the failure of these same distributors to offer denials of conspiracy by national executives in addition to denials by regional representatives of limited jurisdiction suggested inability to deny conniving at the national level. After that experience competent counsel for the distributors could hardly refrain from calling national executives to confirm denials of conspiracy by local agents in any future case where national officers could offer such confirmation. It seems to me that where the absence of a certain type of testimony has been viewed by the Supreme Court as suggestive of conspiracy in one case, the presentation of such testimony in the next

[1]. The substance of this finding appears a second time and is elaborated in the following summation near the end of the district court's opinion: "I am of the opinion that a restraint of commerce in the distribution of motion pictures which is imposed as a result of the adoption of a general policy, implemented by a system of clearances intended to operate uniformly throughout the entire field of exhibition and wholly to suppress a new form of competition, is an unreasonable restraint and I hold that these defendants in imposing such a restraint are violating the antitrust laws."

Later, in disposing of requests for findings the court referred to this matter of general conspiracy against drive-ins as "the real issue in this case."

case should not be regarded as affirmative proof of a similar conspiracy.

Beyond the deficiency of affirmative proof, direct or circumstantial, of a general program to relegate drive-in theatres to subsequent run status, several disclosures in the record should preclude such a finding. The theory of plaintiffs' case and of their attempted proof was not a general conspiracy against drive-in theatres but rather an unreasonable refusal to give their theatre first run privileges which other drive-ins enjoyed. To this end plaintiffs sought by *subpoena duces tecum* to require the defendant distributors to produce all license agreements from 1947 through 1950 with drive-ins wherever located for first run exhibitions. This was objected to as irrelevant and unduly burdensome. The court sustained the objection. Moreover, during the trial when an effort was made to show on what runs a drive-in theatre near Scranton, Pennsylvania, showed films, the court sustained the objection saying, "I don't care whether they have first runs or not." I am unable to square these rejections of direct evidence offered to prove the first run status of various drive-in theatres with an ultimate finding, based on inference, of a general program to deny theatres of this type first run status.

Beyond this there was some direct evidence of first run exhibitions in drive-in theatres. Despite the court's ruling on the irrelevance of such evidence, a few significant items did get into the record. Most striking is the testimony volunteered by David Milgram one of the plaintiffs, that in 1949 the division manager of one of the defendant distributors told him that "where they have drive-ins they have been treated with individually; in many cases they have been given first run, in other cases they have been given 7 or 14 day clearances * * *." In addition, considerable testimony was introduced concerning Chester, Pennsylvania. All of it showed that a drive-in theatre was permitted to compete for the highest priority enjoyed by theatres in downtown Chester, although exhibition in the entire Chester area was postponed until after first run showings in Philadelphia.

Although the two items last cited were offered to sustain plaintiffs' contention of unfair discrimination between his theatre and other drive-ins, in effect they weigh heavily against the finding now in question. They show that the finding for the plaintiffs on the basis of a general conspiracy against drive-ins was contrary to the plaintiffs' own evidence as well as plaintiffs' theory of their case. The disregarded testimony was particularly significant both because it was not contradicted and because there seems to be no testimony that any drive-in theatre other than plaintiffs' has been denied the privilege of bidding for first run exhibitions.

Thus, the whole record considered, I find no escape for the conclusion that the finding of a general conspiracy to subordinate drive-in theatres is clearly wrong and cannot support the judgment based upon it.

II

There is also a subsidiary finding of fact, essential to the ultimate finding already discussed, which the evidence does not support. Whether the alleged conspiracy be viewed as directed against drive-in theatres generally as the district court found or designed locally to deprive plaintiffs' enterprise of a reasonable competitive opportunity in its community as plaintiffs contended, the conclusion of wrongdoing is dependent upon an initial finding that the several district managers denied plaintiffs' request with knowledge that their competitors were taking the same position. The establishment of this fact is the very foundation of the whole rational structure of decision.

Specifically, the district court stated: "The advent of a first-class drive-in theatre demanding first-run showings in the Allentown district created a novel problem of the keenest interest to every branch manager. It is incredible that each proceeded in ignorance of how the others were dealing with it. Certainly the exhibitors (who vigorously opposed the plaintiff's request) knew what was

being done by each distributor and the information would speedily get to the others through them, if no other way. There may or may not have been a direct interchange of information as to action and policies between them, but it is simply not possible that branch managers did not keep track of what their competitors were doing or that, if any one of them had licensed first-run pictures to the plaintiff, the others would not have known of it without delay. I find, therefore, that every distributor adopting and adhering to the uniform course of excluding the plaintiff from competing for first-runs did so knowing that the others were doing the same thing."

In brief, it was deemed inherently so improbable that each district manager would be ignorant of what the others were doing about the new drive-in theatre as to justify an affirmative finding of such knowledge when the only testimony on the subject was the denial of such knowledge by all the persons involved. At the same time the district court expressly declined to find any "direct interchange of information" among the area managers. Rather it was the general picture of the Allentown area and its movie industry from which the district court drew the inference that each manager must have known on what run other managers were releasing films to plaintiffs' theatre. This clearly was error.

Here was no case of known long standing requests for first run pictures by a theatre in daily operation, where the denial of those requests could be inferred from observation of a theatre marquee or the amusements page of a daily newspaper. If such had been the situation an inference that each distributor knew what position the others were taking in the release of films to the theatre in question might have been permissible. Cf. William Goldman Theatres v. Loew's, Inc., 3 Cir., 1945, 150 F.2d 738; Ball v. Paramount Pictures, 3 Cir., 1948, 169 F.2d 317. But the circumstances of this case are quite different. Plaintiffs' drive-in theatre was new, having opened for the first time for a few weeks during the fall of 1949. Only old pictures were requested for that period. It was only after the theatre closed for the late fall and winter seasons that defendants had to decide, in response to plaintiffs' request, whether first run privileges should be accorded the drive-in theatre for its 1950 spring reopening. Moving speedily during this closed season plaintiffs filed the present suit on February 10, 1950, before their theatre reopened and even before the defendants had given positive answers to plaintiffs' request. Between November, 1949, and February, 1950, there was nothing for the area managers to observe in the routine of their daily business or personal activities in Allentown which should have indicated a decision by any of their competitors concerning the run on which pictures would be made available to plaintiffs' theatre upon its future reopening. It does not even appear that each manager knew his competitors were considering this question, much less that they had resolved to deny plaintiffs' request.

For emphasis I restate that the district court declined to find any discussion or "direct interchange of information as to action and policies" among the defendants' representatives. It seems reasonable to believe that the court regarded any such finding as conjectural. But, absent that finding, the conclusion that somehow in the routine of their activities each learned what the others had decided is equally conjectural. I cannot see how a conspiracy can be found when it has not even been proved that any alleged conspirator knew what any other was doing.

The opinion of this court does not discuss this finding of knowledge, but merely states as a fact that each defendant knew the policies of the others. It was the responsibility of the plaintiffs to prove this fact, essential to their case. They did not do so and we should not relieve them of that responsibility.

III

To the foregoing analysis of the facts in this case it seems appropriate to add an

observation concerning the function of a court of appeals in reviewing findings of the type here involved.

We all are acutely aware of the advantageous position of the trial judge wherever decision depends upon the credibility of witnesses. We try constantly to avoid substituting our judgment for that of the trier of fact upon matters peculiarly within his province. In many cases, and certainly in this one, we know that the trial judge is wise and painstaking to a degree notable even on a trial bench where such qualities are taken for granted.

But here the proof is circumstantial. The questioned findings could not be made by accepting as true what some witness or witnesses had said. The district court had to decide what inference or inferences could reasonably be drawn from a particular fact situation. We must do the same thing without permitting our respect for the district court to create any disposition to agree with it. For in a situation of this type, the reviewing court must recognize its own competency and accept its own responsibility to make an independent determination whether inferences are reasonable. Cf. In re Kellett Aircraft Corp., 3 Cir., 1950, 186 F.2d 197; Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 1941, 119 F.2d 704.

We were confronted with a problem of this character in an earlier motion picture antitrust case. Ball v. Paramount Pictures, supra. It was our position there that where distributors are charged with a violation of the antitrust laws in severally denying an exhibitor first run pictures and the plaintiff has attempted to prove concerted action pursuant to common understanding by circumstantial evidence, this court must determine for itself what inferences are permissible. There was divergence of opinion in the Ball case, but not with reference to the above stated doctrine.

It seems to me, therefore, that such a critique of the trial findings as has been undertaken in this dissent is obligatory.

## IV

Passing from fact finding to legal conception, I think the district court arrived at its decision through misconception of the essential requirements of conspiracy in such a case as this.

The court stated in its opinion that the Supreme Court and this court have so far relaxed the requirement of agreement among alleged conspirators in antitrust cases that "in practical effect, consciously parallel business practices have taken the place of the concept of meeting of minds which somewhat earlier cases emphasized". This was the crux of the court's legal analysis. To the same effect, in approving three requested findings containing references to "agreement" among the defendants, the court was careful to say that "The words 'agreed' and 'agreement' are to be understood in the light of the concept of agreement as developed by the Supreme Court in recent antitrust cases". A painstaking judge was thus making clear the precise legal basis upon which he was proceeding.[2] Moreover, in applying this conception I think it is clear that the court repeatedly used the phrase "concert of action" to mean no more than "consciously parallel business practices".

This analysis of the court's position seems to explain its view that it was unnecessary to find any communication among the defendants. Knowledge by each, however obtained, of what the others were doing was thought to suffice. To state the matter somewhat differently, the court seems to have reasoned that it is permissible to proceed to a legal conclusion of conspiracy in restraint of trade from an ultimate factual finding of "consciously parallel action" without any finding of a "meeting of the minds" of the alleged conspirators in the sense of agreement upon a common course of action reached by collaboration, however effected. This reasoning was decisive here because on the evidence the court was unable to conclude that there had been even the most informal

2. The court also was careful to state that in the event of any inconsistency between its findings, made by the adoption of certain formulations of the parties, and its opinion, the opinion should prevail.

collaboration among the defendant distributors.[3] It skipped that step and moved from conscious parallelism as the ultimate fact to conspiracy as a legal conclusion believing that the Supreme Court and this court had sanctioned that course of reasoning.

I think, however, that only where conscious parallelism of action justifies and the trier of fact makes a finding of actual, if informal, agreement among the defendants can there be in law in this type of case a combination in violation of the antitrust laws. Certainly "conspiracy" and "combination", the nouns used in Section 1 of the Sherman Act to describe the conduct in restraint of trade there prohibited, connote collaboration and agreement both in common understanding and as normally applied in antitrust cases. Indeed courts have contrasted that "combination" which is essential to a Sherman Act violation with uniform business practices achieved without collaboration which may constitute unfair commercial practices in violation of the Federal Trade Commission Act, but not the Sherman Act. See Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 708–709, 68 S.Ct. 793, 92 L.Ed. 1009; Triangle Conduit & Cable Co. v. Federal Trade Commission, 7 Cir., 1948, 168 F.2d 175, 181.

It is only recently that language in the cases has been thought to recognize the possibility of combination within the meaning of the Sherman Act without collabora-

---

3. On the record it is easy to see why the court did not find connivance or any sort of collaboration among the defendants. Commenting on the testimony the court said:

"The defendants * * * [offered] testimony as to the reasons for the judgment reached. Primarily, they are apprehensive that the exhibition in a drive-in theatre of any good feature picture on its first run would depreciate the sales value of the picture, both for subsequent runs in the neighborhood and for first-runs in other communities so that, even if the distributor could get a very good price for first-runs from a drive-in, he would fail to get the maximum return from the picture. Another reason, not so strongly pressed, is the possibility that, unless prohibitively high guarantees were given, the returns from the first-run showing in a drive-in of any given picture, arising from percentage payments, would be less than if it were shown in a conventional theatre. . .

"Whether they are right or wrong about these matters I would not attempt to say * * *."

Several circumstances make the court's unwillingness to fault defendants' reasoning both understandable and proper. Center city Allentown was the shopping center and transportation hub for a region of some three or four hundred thousand inhabitants. The special advertising value of a showing there as an aid to subsequent runs is apparent. No defendant had any interest in any first run theatre in Allentown. The defendants had heretofore enjoyed good business relations with plaintiffs and the court found the ownership of the drive-in theatre no factor in the defendants' decisions.

Against this there had to be considered the fact that defendants were unwilling to give pictures to plaintiffs' theatre even if a premium should be paid above the largest amount offered by a downtown theatre. But this was explained by defendants' view that in the long run no premiums which plaintiffs could afford would compensate for losses on subsequent exhibitions. And the court had no basis for saying that this was an erroneous or unreasonable conclusion.

The impression which the evidence made on the court as to the very real problem involved in first run releases to plaintiffs' theatre is strikingly revealed by a statement made from the bench during a colloquy with counsel. The court said: "I recognize that at the present time everbody expects to see 'junk' at the drive-in theatre." The court added that one would anticipate an elevation of drive-in theatres in public esteem after a period of first run exhibitions. But that very necessity for a period of public education to change popular notions about drive-in theatres makes it credible and probable that each of eight distributors would independently refuse to be the innovator. This is no case of several persons making identical changes of policy. Rather, each is refusing to do something new and different, involving economic uncertainty and hazard. Therefore, the fact that all made the same decision is no basis for inference of collaboration. Such a finding would have been speculative to the point of guessing. The court was properly unwilling to make such a guess.

tion among the alleged wrongdoers.[4] In the present case it was the district court's construction of Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, and its reading of language of this court in William Goldman Theatres v. Loew's, Inc., 1945, 150 F.2d 738, 745, which led to such an enlargement of the normal conception of conspiracy or combination. I think this was a mistaken view of those cases.

The Interstate Circuit case arose out of a request of a motion picture exhibitor, enjoying first run privileges in a number of communities, that the several distributors inaugurate throughout that area new and restrictive subsequent run policies, principally price fixing through the maintenance of increased minimum admission charges. The exhibitor's letter to each distributor indicated that the same request was being made of all the other distributors. Therefore, each distributor knew that a general scheme of price fixing was proposed and that all were being asked to adhere to it. In these circumstances, there could be no such thing as independent action in establishing and maintaining the suggested new price structure. In its nature and on its face the proposal called for collusive action.

While the district court did not mention the Paramount case in this connection, it is noteworthy that the reasoning there concerning the finding of a price fixing conspiracy is in line with the Interstate Circuit case. Both the district court and the Supreme Court were satisfied that the evidence revealed a plan for industry wide price fixing, however it may have been initiated. That was the fundamental datum. Once it had been established the adherence of distributors to the plan severally and without agreeing among themselves to do so sufficed to bring each adherent within the conspiracy.

Similarly, in other areas of commerce, persons separately joining a formulated and proposed scheme to control prices or methods of distribution have been held thereby to become participants in a conspiracy. Cf. United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.

But it seems to me that, like the Interstate Circuit case, all of these cases do no more than show that given proof of a plan in restraint of trade looking to group action and reasonably so understood by prospective adherents, those who adhere join a conspiracy even though each decides to participate without consulting any other.

In contrast, this case involves no scheme, no plan of common action, unless we assume the very thing that the district court was unwilling to find, namely, collaboration among the defendants themselves. The motivating proposal of common action which made direct dealing among the defendant distributors unnecessary in the Interstate Circuit case and analogous situations is missing here.

While the Interstate Circuit case does not support the conclusion of the district court, it must be conceded that language of this court in the Goldman case, if taken out of context, does. There we said: "Uniform participation by competitors in a particular system of doing business where each is aware of the other's activities, the effect of which is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the statute before us." 150 F.2d at page 745. But in that case there was ample reason for inferring, indeed this court held it to be a necessary inference, that defendants acted pursuant to "some form of informal understanding" 150 F.2d, page 743, among themselves. In all the circumstances their consciously parallel courses of action were explicable only on the basis of collaboration among them. Therefore, collaboration had to be found as a fact. It was in this

---

4. See, e.g., Bordonaro Bros. Theatres v. Paramount Pictures, 2 Cir., 1949, 176 F. 2d 594 semble; Bigelow v. R.K.O. Radio Pictures, 7 Cir., 1945. 150 F.2d 877 semble, reversed on other grounds, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Note, 3 Stan.L.Rev. 679 (1951), and references therein cited to other commentaries.

context that we used the quoted language. I think it should not be construed as approving a legal conclusion of conspiracy from the fact of uniform business practices without an intervening finding of collaboration. In my view the words used were but shorthand for the conception that, surrounding circumstances permitting, similarity of business conduct may be the basis of an inference and a finding of collaboration which in turn warrants a legal conclusion of conspiracy. If our shorthand has suggested that a short cut to conspiracy is permissible, I think our meaning should now be elaborated and the erroneous impression corrected.

I am not sure that my colleagues disagree with my view that collaboration and "meeting of the minds" are essential to conspiracy in situations of this type. It may well be that our difference on this point arises from their premise that collaboration among the defendants has been established here. If this is the majority view, I can only repeat that on the evidence here the district court was at great pains—and it seems to me properly so—to avoid the very difficult finding of agreement in the sense of actual collaboration, although it believed such a finding was not essential to liability under the Interstate Circuit and Ball cases.

V

I think it is also important to point out what seems to me a logically inescapable result of this decision. The reasoning which has prevailed does not depend upon anything peculiar to drive-in theatres. It concerns a theatre located in Allentown but some two miles from the downtown commercial area. Therefore, in practical consequence this court is saying that it will approve a requirement that first run privileges be extended on a competitive basis to physically adequate neighborhood theatres. It is common knowledge that in large urban communities feature

motion pictures are exhibited in successive runs usually beginning in the center city commercial area. If a large and well appointed neighborhood theatre comparable physically to the first run theatres in the commercial area should ask several distributors for first run privileges and be denied that priority by all, I think the neighborhood exhibitor would be entitled to injunctive relief under the reasoning that has prevailed in this decision. For it seems reasonable to anticipate that as much could and would be shown in proof of conspiracy in any such case as was shown here.

Such a change might well be a matter of major consequence in the country wide functioning of a large industry. Perhaps it would be desirable. My concern, however, is that without addressing ourselves to this larger issue we may well have encompassed it by the sweep of our adjudication on the problem at hand.

Moreover in United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, the Supreme Court has disapproved a requirement that the privilege of first run exhibitions be opened up to competitive bidding throughout a competitive area. I think we are in practical effect sanctioning just such a requirement.

VI

One other matter deserves mention. It may appear small in this case but I think it is potentially of large importance.

This court states that the "past proclivity of these defendants to unlawful conduct" strengthens the inference of similar misconduct here. However, the record is barren of evidence introduced for this purpose.[5] Apparently, this court relies upon judgments and findings in earlier litigation involving transactions antecedent to those now in suit. Upon this basis this court reasons that these defendants have conspired before and therefore it is easier to find that they are at it again. I think this

5. Plaintiff did seek to introduce in evidence the 1948 Paramount litigation, solely for the purpose, however, of bringing his case within the operation of Section 5 of the Clayton Act [See footnote 6, infra], whose relevancy was at once rebutted. Apparently the court ruled that it would take judicial notice of the Paramount suit as case law precedent.

reliance upon past misconduct is improper and sets a very dangerous precedent.

This evidentiary use of prior disposition to wrongdoing is thought by my colleagues to be sanctioned by language of the Supreme Court in United States v. Paramount Pictures, supra, and by passing references to that language by this court in Ball v. Paramount Pictures, supra. However, in the Paramount case, the Supreme Court stated merely that certain requested relaxation of the stringency of the decree under review would leave "too potent a weapon * * * in the hands of those whose proclivity to unlawful conduct has been so marked". 334 U.S. at page 147, 68 S.Ct. at page 924. Essentially, the same idea was restated on the following page with the notation "Cf. United States v. Crescent Amusement Co., 323 U. S. 173, 188, 65 S.Ct. 254, 261, 89 L.Ed. 160". I think the Supreme Court was talking about "proclivity" revealed in the record then before it and nothing more than that. A great mass of testimony had been taken in the Paramount case concerning local and national practices of the motion picture industry over many years. I can find no basis for believing that the Court was referring to anything other than the revelations of that record. The notation to compare the decision in United States v. Crescent Amusement Co. seems to confirm this conclusion. For in that case there is clearly no question of matter outside of the record but merely the issue of making a decree broad enough to cover the proven wrongdoing. Moreover, in the pertinent parts of both Paramount and Crescent Amusement the Court was concerned, not with proof of present conspiracy, but rather with the fairness of the remedy after adequate proof of the wrong.

The Ball case was twice before this court. On the first appeal we said merely that "Most of the present appellees are among the defendants in the Paramount litigation who are there characterized as having shown a 'proclivity to unlawful conduct'". 169 F.2d at page 320. There was no amplification of this identifying statement. On second appeal we had occasion to consider the proper scope of the decree entered against the defendant distributors. On this issue we noted the views of the Supreme Court justifying the Paramount decree. In so doing, we quoted the Supreme Court's analysis of the problem before it. The reference to "past proclivity" was part of that quotation. In these circumstances it seems to me that nothing we said even intimates a purpose to go further than did the Supreme Court. On authority, therefore, I think there is no basis for the use of prior disposition to unlawful conduct as evidence of new misconduct and certainly not where the earlier misdeeds have not been a subject of proof and rebuttal in the record at hand.

It is also noteworthy that Section 5 of the Clayton Act contains a narrow and precisely defined authorization to use a judgment or decree rendered in a public suit for violation of the antitrust laws as prima facie evidence of the same conspiracy when it is subsequently charged in a private suit.[6] This statute would have been unnecessary if, without legislation, courts were authorized to make the present far broader use of prior wrongdoing.

My concern about this kind of proof is very great. If such matter is not needed to justify the finding of conspiracy here, I think it has no proper place in our analysis. If, on the other hand, the conclusion of the district court would be unreasonable without this makeweight we are approv-

6. 38 Stat. 731 (1914), 15 U.S.C.A. § 16. "A final judgment or decree rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided*, This section shall not apply to consent judgments or decrees entered before any testimony has been taken."

ing a finding on a basis which runs counter to salutary notions of fairness deeply rooted in our jurisprudence. To imply new wrongdoing from past wrongdoing is in itself alien to our conception of fair trial. To do so without even the introduction of trial evidence and opportunity to rebut it is doubly wrong.

For these reasons I believe the judgment of the District Court in Appeal No. 10439 should be reversed.