Abraham N. Gellee, J.
This is an application by Rye Colony, Inc., owner of a large apartment development in the City of Rye, New York, and one of its principal officers served in an individual capacity, to vacate a subpoena issued by the Attor *211 ney-G-eneral for the purpose of conducting an inquiry based upon a complaint by a Negro woman that they had refused to rent a vacant apartment to her.
Preliminarily, it should be observed that a Judge, in deciding a case involving a controversial matter of significant policy, must be careful to distinguish between his views as an individual and his function as a Judge. In this case the court must put to one side, difficult as it may be, its personal feelings against racial discrimination in any form and render its determination solely on the basis of the applicable law. A Judge may not make, but only interpret, the policy of the State either expressed in or implied from its Constitution, legislative enactments and common law.
A review of the development of the law in this State banning discrimination in housing, and an account of the background of events and proceedings taken in this matter leading up to this application, will help to set the problem in proper focus.
Article 15 of the Executive Law, known as the “ Law Against Discrimination,” was directed at first solely to the problem of discrimination in employment and then extended to places of public accommodation, resort or amusement. A State agency, known as the State Commission Against Discrimination (“ SCAD ”), was created with power to eliminate and prevent such discrimination “ because of race, creed, color or national origin,” for which purposes it was given “ general jurisdiction and power ” (§ 290). The commission was given the power and duty to ‘1 investigate and pass upon complaints alleging violations of this article,” to subpoena witnesses, require the production of books and records, and hold hearings (§ 295).
Effective July 1, 1955 the article was amended to include the subject of discrimination in housing. But the ban against discrimination was limited by the new legislation to ‘ ‘ publicly-assisted housing accommodations,” i.e., those assisted financially with public funds, and was not made applicable to private housing accommodations. It declared it to be an unlawful discriminatory practice for an owner, managing agent, etc., of “publicly-assisted housing accommodations” to refuse to rent to any person because of race, color, creed or national origin, or to discriminate against such person with respect to terms, conditions, privileges, facilities or services (§ 296).
This was the limited state of the applicable law at the time that this complaint was filed and processed. (It may be noted that in 1957 the Administrative Code of the City of New York was amended by adding a provision—•§ X41-1.0, the so-called Sharkey-Brown-Isaacs Law—banning such discrimination in the *212 City of New York in private multiple dwellings and in the sale or rental of 10 or more contiguous 1- and 2-family houses under single ownership or control, and further broadened by an amendment recently enacted. [N. Y. Times, June 17, 1961, p. 23].)
This sworn complaint was filed only recently. Complainant stated that she was a Negro woman resident in Eye, New York, had been refused accommodations for her family in the apartment development known as Eye Colony owned and managed by petitioners, though there was a vacancy at the time, and had been told that they would not rent to Negroes.
“ SCAD ”, based on its finding that Eye Colony was not “publicly-assisted” housing, determined after investigation that it had no jurisdiction under the existing law.
But the law had just been amended to provide for the first time a State ban against discrimination with respect to private housing accommodations. Chapter 414 of the Laws of 1961, which became a law on April 11, 1961 with the approval of the Governor (Executive Law, § 296, new subd. 5), extended the discrimination ban to private multiple dwellings, 10 or more contiguous houses under single ownership or control, and also to commercial space, as well as making it applicable to real estate brokers and lending institutions. As pointed out by the Governor in his message approving the bill, sufficient funds were appropriated thereunder to permit “ SCAD ” to administer its provisions “ in accordance with its traditional State-wide, exclusive jurisdiction.”
This amendatory act is to take effect September 1, 1961. Obviously, after that date, “ SCAD ” will have jurisdiction of complaints of the type here involved and appropriate relief may then be obtained with a view to preventing and eliminating such practices in any multiple dwelling in the State.
In the meantime, however, complainant brought her complaint to the Attorney-General, who, upon being notified on May 9, 1961 of the determination by “ SCAD ” of lack of jurisdiction at this time, authorized ‘ ‘ an inquiry into the basis of the complaint and its pervasiveness.” The subpoena under attack was issued on May 11, 1961, just about a month after the above-described liberalizing amendment was added to the law.
The subpoena refers to specific statutes as authority for the Attorney-General’s inquiry. The purpose is stated to be “to determine whether an application should be made or an action instituted, pursuant to § 63(12) of the Executive Law, for an order enjoining the continuance of certain business activities of Eye Colony, Inc., and pursuant to Article 8 of the General Corporation Law, for the annulment of the corporate charter of *213 said corporation on account of the persistent violation of § 340 of the General Business Law and other illegality.”
Section 63 (subd. 12) of the Executive Law was obviously intended as an expeditious measure to prevent the perpetration of repeated and persistent fraud or illegality in the conduct of any business. The Attorney-General may apply to the Supreme Court on notice of five days for an order enjoining the continuance of such fraudulent or illegal acts. Since under existing law it is not illegal for the owner of private housing accommodations in the State outside of the City of New York to refuse to rent to Negroes, petitioners are not guilty of a violation of law in persisting at the present time in such refusal, and section 63 (subd. 12) does not confer the requisite authority for an inquiry as to such act of refusal.
The general language of article 8 of the General Corporation Law is, likewise, of little help in this context. Presumably the Attorney-General is relying upon section 91 (subd. 1), which authorizes him, upon leave being granted by the Supreme Court, to bring an action to annul the charter of a corporation which has “Violated any provision of law whereby it has forfeited its charter ”. The provision of law, concerning which he seeks to make inquiry to determine whether it has been violated, is section 340 of the General Business Law.
We see, then, that the key to the solution of the problem lies in section 340. Unless there is some justification for an inquiry to determine if petitioners are guilty of violating it, there is no legal basis for any inquiry. It is clear from the Attorney-General’s supplemental memorandum that this is actually the only issue in the case.
Section 340 is the substantive section of article 22, £ £ Monopolies ” (the Donnelly Act), of the General Business Law. It is the New York anti-trust equivalent of the Federal Sherman Act. It declares as against public policy and illegal every agreement, arrangement or combination whereby a monopoly is established or competition or £ £ the free exercise of any activity ’ ’ is restrained. In 1957 it was amended (L. 1957, ch. 893) to substitute in place of the relatively narrow field of its operations described as “ in the manufacture, production, transportation, marketing or sale of any article or product or service used in the conduct of trade, commerce or manufacture ” the broad and practically all-inclusive phrase, £ £ in the conduct of any business, trade or commerce or in the furnishing of any service in this state ’ ’.
The Attorney-General takes the position that he may properly inquire whether there is an arrangement among the owners *214 of the apartment developments in the City of Bye not to rent to Negroes. This is based upon the complainant’s statement that she sought accommodations subsequent to her attempt at Bye Colony at one of the other Bye developments and was similarly refused on account of her color, and upon the statement of an Assistant Attorney-General that it appears that none of the apartment developments erected in Bye since World War II are making any apartments available to Negroes.
The issue, then, is clear. Although under existing State law, discrimination in the rental of private accommodations by any owner is not proscribed, the question is whether an agreement or arrangement among all the owners of a neighborhood area not to rent to Negroes constitutes an illegal arrangement in violation of section 340. If the answer to that question is in the affirmative, the final question will be to decide whether the circumstances relied on by the Attorney-General in this case are sufficient to entitle him to subpoena the petitioners for the purpose of an inquiry as to whether they may be guilty of such a violation.
Begarding the first question—whether an arrangement between real estate owners not to rent to Negroes would constitute an illegal combination restraining the free exercise of any activity in the conduct of a business and thus violative of section 340 — there seems to be no direct authority. Neither party has been able to discover any case in point. It seems to me that the broad language substituted by the Legislature in the 1957 amendment of section 340 was intended to apply to the conduct of any business. There can be no question as to the renting of apartments being a business. If the owners of property in a certain section agree not to rent to Negroes, in addition to the restrictive monopoly thereby established against Negroes there will exist a restraint arising from the obligation undertaken and the pressure of the group upon the free exercise of judgment on the part of individual members of the group who might, if not subjected to such influence or coercion, be later inclined to change their views. The Sherman Act, the prototype of our section 340, has been invoked to attack an agreement among 39 New York City lending institutions to refuse to lend mortgage money to persons owning property in areas where Negroes and Spanish-speaking persons lived; the Federal anti-trust suit was terminated without a trial by a consent judgment, whereby defendants dissolved the newly-formed organization (United States v. Mortgage Conference of New York, civil action No. 37-247, U. S. District Court, Southern Dist. of N. Y.). Deference has also been had to the article *215 “Application of the Sherman Act to Housing Segregation ” (63 Yale L. J. 1124 [1954]), which discusses the manner in which the Sherman Act has been used to attack housing segregation in some aspects in which restrictive practices have been adopted. Although this particular problem of rental discrimination is not touched upon in the article on the ground that such activities are entirely local in nature and covered, if at all, by State anti-trust legislation, my study of the subject would indicate that New York’s anti-trust law—section 340 — may be broad enough to encompass within its prohibitions such an agreement by a combination of neighborhood property owners.
The final question to be answered, which is dispositive of this application, is whether this is a proper case authorizing the issuance of subpoenas by the Attorney-General for the purpose of an inquiry to determine whether petitioners are guilty of a violation of section 340.
As may be expected, article 22 of the General Business Law contains procedural sections for the enforcement of the provisions of section 340. Though not referred to in the papers before the court, section 343, ‘ ‘ Investigation by the attorney general ”, is the most direct authority on the precise issue here involved. If taken literally, it would appear to give him practically unlimited power. It empowers him to subpoena witnesses, require the production of books and records, and obtain testimony whenever it appears to him that any person is engaging or about to engage in any prohibited act under the article or participating or assisting therein “ or whenever he believes it to be in the public interest that an investigation be made ”.
The courts have held that there is a limit to the Attorney-General’s power to invoke compulsory process for such an inquiry.
In Carlisle v. Bennett (268 N. Y. 212, 217-218), dealing with a similar question involving a similar investigatory provision (General Business Law, § 352) under the Martin Act (General Business Law, art. 23-A) relating to fraudulent practices in the sale of securities, the court said:
‘1 However broad the statutory language may be, the discretion must be exercised within bounds circumscribed by a reasonable relation to the subject-matter under investigation and to the public purpose to be achieved. So we have said that ‘ the statute does not commission the Attorney-General to embark upon any roving course for the purpose of generally prying into the affairs of any person.’ (Dunham v. Ottinger, supra [243 N. Y. 423, 433].) * * *
*216 “ Since there is a limit to the exercise of the Attorney-General’s discretion, the witness subpoenaed has the right to secure an adjudication as to whether that limit has been exceeded.”
While the Attorney-General may under the applicable statutes issue subpoenas and conduct an inquiry in an attempt to obtain evidence of a violation of section 340, there must be some reasonable ground for the belief that such evidence is obtainable. Otherwise, the inquiry is a roving and fishing expedition which constitutes an invasion of the fundamental right of an individual under our law to be free from the compulsory process of Government unless there be present such facts and circumstances as, when developed, would warrant an implication of wrongdoing on his part.
The sole basis offered by the Attorney-General for this inquiry is “ that it appears that none of the apartment developments in the City of Bye are making any apartments available to Negroes, and that this condition may result from an arrangement between and among the project owners ” (“ Supplemental Memorandum ”). It is stated that, perhaps, evidence of such an arrangement may be contained in the corporate minutes of petitioner corporation.
In the present posture of the law against discrimination, it is not, and until September 1, 1961 when the amended statute against discrimination takes effect it will not be, illegal for an owner of privately-financed housing in Bye to refuse to rent to Negroes (Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512, certiorari denied 339 U. S. 981 ; Matter of N. Y. SCAD v. Pelham Hall Apts., 10 Misc 2d 334). The position of these owners on this question may simply be due to an identity of opinion which they are not forbidden by existing law from individually applying in their rental operations. Since, therefore, there is nothing illegal in such present refusal, the fact that all of the owners of the recent apartment developments in Bye may refuse to rent to Negroes cannot in and of itself be the basis for an inference that it may be the result of an agreement or arrangement among them.
It is only concerted action which is prohibited. It is true that circumstantial evidence of such an agreement would be sufficient, and that the concept has been adopted, at least in one leading case (Milgram v. Loew’s, 192 F. 2d 579, certiorari denied 343 U. S. 929), that “ consciously parallel” action by persons in the same business may be sufficient to create an inference of a prohibited arrangement by a combination. But that concept, it seems to me, can properly be applied only in an industry involving closely interrelated activities or where the individual *217 act itself, being prohibited in direct form by law, is indirectly contrived to be done by all of the persons in the group.
Thus, while present parallel action in refusing to rent to Negroes cannot alone create the necessary inference, the situation may well be different after September 1, 1961. It will then be illegal to refuse to rent to Negroes and a stronger case for the drawing of the inference may then be made, if the same condition of total nonavailability to Negroes of vacant apartments in Bye continues to obtain, on the basis of the various excuses or explanations given by each of the owners for such refusal. Whether, an inquiry along such lines on the basis of complaints would fall within the jurisdiction of “ SCAD ” as being a phase of the discrimination problem or within the powers of the Attorney-General under the Donnelly Act (Generally Business Law, art. 22) or be cognizable by both, is a matter properly to be decided at that time. This court obviously cannot disregard the legislative mandate that the new law becomes effective on September 1, 1961, or fill the vacuum which will exist until then, by a legislative determination in the guise of a judicial ruling.
But, in any event, complainant’s grievance will have a remedy after September 1, 1961. There would seem to be no practical utility in attempting by indirect means to correct a continuing situation which will so shortly become subject to a specific statute expressly designed to correct it. Prom this point of view the issuance of the subpoena after the enactment of the amendatory law but prior to its effective date would appear to serve little useful purpose. The new statute will become effective long before the powers asserted by the Attorney-General in this proceeding can be finally tested in our appellate courts. Decision on this application, however, rests upon the lack of a showing of such circumstances as to entitle the Attorney-General to issue a subpoena compelling the attendance of petitioners for the purpose of an inquiry to determine whether they are guilty of a violation of section 340 of the General Business Law.
The application to vacate is accordingly granted.