297 F.2d 199
 DELAWARE VALLEY MARINE SUPPLY COMPANY, Appellant,
v.
AMERICAN TOBACCO COMPANY, Philip Morris, Incorporated; Liggett & Myers Tobacco Company; R. J. Reynolds Tobacco Company; P. Lorillard Company; Lipschutz Bros., Inc.; Janis Lipschutz, Executrix of the Estate of Albert Lipschutz, Deceased; Janis Lipschutz; Morton Lipschutz; Mae Lipschutz.
 No. 13369.
 United States Court of Appeals Third Circuit.
 Argued June 6, 1961.
 Decided December 8, 1961.
 
 Edwin P. Rome, Philadelphia, Pa., for appellant (Morris L. Weisberg, Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., on the brief).
 Joseph W. Swain, Jr., Philadelphia, Pa., for appellee Liggett & Myers Tobacco Co. (C. Brewster Rhoads, S. Jonathan Emerson, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., on the brief), and for all appellees.
 John B. H. Carter, Philadelphia, Pa., for R. J. Reynolds Tobacco Co. and for all other appellees.
 John G. Harkins, Jr., Philadelphia, Pa., for appellee R. J. Reynolds Tobacco Co. (Pepper, Hamilton & Scheetz, Philadelphia, Pa., on the brief).
 R. Sturgis Ingersoll, Philadelphia, Pa., for appellee American Tobacco Co. (Joseph P. Flanagan, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., on the brief).
 H. Francis DeLone, Philadelphia, Pa., for appellee Philip Morris, Inc. (Matthew J. Broderick, Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., on the brief).
 Jay H. Eiseman, Philadelphia, Pa., for appellees Lipschutz Bros., Inc., and others (Ronald H. Isenberg, Barba & Eiseman, Philadelphia, Pa., on the brief).
 Robert W. Sayre, Joseph Neff Ewing, Jr., Saul, Ewing, Remick & Saul, Philadelphia, Pa., for appellee P. Lorillard Co.
 Before BIGGS, Chief Judge, and HASTIE and FORMAN, Circuit Judges.
 BIGGS, Chief Judge.
 
 
 1
 The plaintiff-appellant, Delaware Valley Marine Supply Company, has sued the defendants-appellees, American Tobacco Company, Liggett & Myers Tobacco Company, P. Lorillard Company, Philip Morris, Incorporated and R. J. Reynolds Tobacco Company (the "tobacco companies"), Lipschutz Bros., Inc. and the individuals named in the title of this cause, alleging violation of Section 1[1],[2] of the Sherman Act, 15 U.S.C.A. § 1. The plaintiff seeks treble damages, attorney's fees and injunctive relief. Judgment was entered for all the defendants and the plaintiff has appealed.
 
 
 2
 The plaintiff, Delaware Valley Marine, is a corporation organized to sell tax-free tobacco products and liquor to vessels engaged in the foreign trade entering the Port of Philadelphia. It applied to the defendant tobacco companies for a "direct listing," to enable it to purchase cigarettes tax-free for resale to ships. All of the tobacco companies[3] declined to sell cigarettes to the plaintiff, and it never commenced to do business. At the time of the tobacco companies' refusals to do business with the plaintiff, all were selling direct to Lipschutz Bros., Inc., an established firm in the business of selling tobacco, whiskey and other supplies to ships in the Port of Philadelphia. In addition, Reynolds and Lorillard had a second Philadelphia outlet, M. J. Kelly Company, which was in the business of selling a full line of ship supplies. The plaintiff alleges that the tobacco companies acted in concert in restraint of trade and that Lipschutz in effect aided and abetted the conspiracy.
 
 
 3
 After all of the plaintiff's evidence had been presented the defendants moved for a directed verdict pursuant to Rule 50(a), Fed.R.Civ.Proc., 28 U.S.C. These motions were denied;[4] they were also denied when renewed at the close of all of the evidence. The trial court then submitted all issues to the jury on special interrogatories pursuant to Rule 49(a). After deliberating for five hours the jury was unable to agree on an answer to the first interrogatory[5] and was discharged. All the defendants then moved for judgment in accordance with their earlier motions for directed verdict as authorized by Rule 50(b).
 
 
 4
 The defendants argued that the plaintiff's case was fatally defective in three respects:[6] (1) that no proof had been introduced from which the jury could find that the plaintiff had such a business or property interest as to give it standing to maintain the suit at bar; (2) that there was no direct evidence of conspiracy and none from which a jury could infer that the defendants had conspired; and (3) that there was no proof that the plaintiff had suffered any damage. Reversing the position it had first taken when the motions were made, prior to the submission of the interrogatories to the jury, the trial court granted the defendants' motions to dismiss the action on the ground that the plaintiff had not proved any damage. See 184 F.Supp. 440. As the plaintiff had stated its view that a finding of damage was a necessary basis for the granting of injunctive relief, the trial court refrained from passing on evidence submitted by the plaintiff to prove the conspiracy. In view of the disposition that we make of the litigation it is unnecessary to pass on the issue of whether proof of damages is a prerequisite to obtaining an injunction. In disposing of the Rule 50(b) motions the trial court also ruled that there was evidence from which the jury was entitled to find that the plaintiff had a business within the meaning of Section 4 of the Clayton Act, 15 U.S.C.A. § 15, and therefore possessed the standing to maintain the suit at bar. The defendants have not contested this ruling.
 
 
 5
 On appeal the plaintiff urges that the trial court's ruling on damages was erroneous. The defendants contend that it was not and assert also that the plaintiff failed to produce any evidence of conspiracy and that therefore the motions for directed verdict in their favor must be granted.[7]
 
 
 6
 On motions for a directed verdict in favor of the defendants[8] the evidence must be considered in the light most favorable to the plaintiff and it is entitled to the benefit of all inferences which can reasonably be drawn from the record in its behalf. So viewing the case we conclude that the judgment below must be affirmed because of the failure of the plaintiff to produce evidence from which a jury would be entitled to infer that the defendants had conspired in refusing to deal with the plaintiff.
 
 
 7
 In so concluding we are aware of the difficulties of proof of modern anti-trust conspiracy and that the difficulties increase as the number of conspirators lessens.[9] It is certainly true that "the picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age."[10] But it is the fact that conspiracy remains an essential ingredient of a case based on Section 1. Conscious parallelism, relied on heavily by the plaintiff here, is of aid in demonstrating the existence of sophisticated and silent agreements which so often have injuriously restrained trade. But conscious parallelism is not yet a conclusive legal substitute for proof of conspiracy.[11] It is circumstantial evidence the probative value of which necessarily varies with the kind of parallelism and the factual setting where it is found.[12] Some business practices may provide strong evidence of agreement: sealed bids for 6,000 barrels of cement, for example, from eleven firms, identical to the fraction of a cent, could hardly be coincidence.[13] The inference of agreement is strengthened if the participants are many and if they comprise a non-oligopolistic industry, where the economic pressures forcing action and reaction with competitors are absent. But, as we stated in Milgram v. Loew's Inc., 192 F.2d 579, 583 (3 Cir., 1951), cert. denied 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952): "This does not mean * * * that in every case mere consciously parallel business practices are sufficient evidence, in themselves, from which a court may infer concerted action." We think this case falls within the category that we recognized in our dictum in Milgram, the category in which conscious parallelism is not enough.
 
 
 8
 As is usual in Section 1 cases, the plaintiff here offers no direct proof of conspiracy. In effect, all of the direct evidence is to the contrary for all the defendants have denied expressly the existence of any agreement. The plaintiff's case at its best can be summed up as follows: In January or February, 1956, Drew J. T. O'Keefe, Esquire, a member of the Pennsylvania Bar, who was one of the parties interested in forming the plaintiff corporation,[14] contacted two local tobacco company representatives, Beckwith of Philip Morris and Comey of Reynolds. During the ensuing discussions, conducted separately, O'Keefe asked to purchase cigarettes and indicated that he intended to get in touch with all major cigarette manufacturers. Both Beckwith and Comey refused the applications but stated that their principals probably would sell to the plaintiff if it obtained other brands of cigarettes for sale. No additional contacts were made with any of the defendants until July, 1956, some weeks subsequent to the incorporation of the plaintiff. At this time letters of application were sent to at least three of the tobacco companies, PM, American and Liggett & Myers. Reynolds and Lorillard claimed that these letters were not received by them and were not mailed. Receiving no response, the plaintiff sent registered letters to these three defendants on August 21, 1956, offering to buy C.O.D., and asserts that it sent identical registered letters to the other two tobacco company defendants. Reynolds and Lorillard contend that they did not receive these letters. We will assume arguendo that there was sufficient evidence offered by the plaintiff to prove to the jury that the plaintiff's letters were mailed by it to Lorillard and received by that company. As stated, O'Keefe previously had made direct contact with a representative of Reynolds and had tried to purchase cigarettes from that company.
 
 
 9
 In the interval between the letters, i. e., between July 7 and August 21, Clark, who was to be the plaintiff's manager, saw Miss Tooher, who was in charge of tax-free sales at L&M, at the company's New York office. He was informed that L&M did not wish to add another distributor in Philadelphia at that time. On the same day that Clark saw Miss Tooher he had an interview with Turner, secretary of Philip Morris Overseas. Clark was encouraged after this visit, although PM did not commit itself. PM was the only tobacco company with which the plaintiff had any contact after the letter of August 21, 1956. During the first part of 1957, PM made a thorough investigation of the plaintiff and decided not to alter its earlier decision of rejection. For the purposes of this decision we will assume that it is a fact that all of the defendant tobacco companies rejected the plaintiff's applications for direct listing. The defendants urge that there can be no finding of parallelism because the manner of rejection was not uniform: L&M and American denied the application by letter without any investigation; Lorillard and Reynolds did not even answer the letters; PM adhered to its earlier decision but only after extensive investigation and consideration. But the defendants cannot escape the impact of the anti-trust laws so easily.[15] If it were otherwise a charge of conspiracy could always be avoided by agreeing to go home by different roads. The plaintiff's case, of course, would be the stronger if it would show that all the tobacco company defendants had rejected the plaintiff's applications in the same way: vide, the automatic refusal to deal of Milgram v. Loew's, supra. But there was uniformity of action on a crucial point: all the corporate defendants denied the plaintiff's applications. If there are sufficient other facts and inferences which can be drawn from the record from which the jury might reasonably find concerted action, the plaintiff will not be prevented from recovery simply because of differences in the ways in which its applications were rejected by the defendants.
 
 
 10
 The issue of whether there is evidence from which a jury could find that the defendants or some of them knew that other defendants had or would reject the plaintiff as a purchaser is a troublesome one. All of the defendants, save PM, deny that they had knowledge that the plaintiff's application had been or would be denied by any other defendant tobacco company. During 1957, PM, in adhering to its earlier decision not to place the plaintiff on its direct sales list, was aware of the fact that the plaintiff had experienced difficulty in obtaining cigarettes from other companies. The plaintiff's representatives testified that they disclosed this fact to PM's representatives in an interview in 1957.[16] Although we do not find the testimony of the other defendants' witnesses to the effect that they were not aware of the rejections by the other tobacco companies of the plaintiff's applications "incredible" as we did in Ball v. Paramount Pictures, Inc., 169 F.2d 317, 320-321 (3 Cir., 1948), cert. denied 339 U.S. 911, 70 S.Ct. 568, 94 L.Ed. 1337 (1950), we do conclude that there is in the record some evidence from which a jury would be entitled to infer that each of the tobacco companies was aware of the action taken by each of the others.
 
 
 11
 Thus the evidence in the record is sufficient to support a finding by a jury of conscious parallelism but in this case consciously uniform business behavior of the kind shown, standing alone, is not enough to sustain a finding of conspiracy. The situation at bar was not of a sort which allowed much scope of action to the participants. The tobacco companies of course could say whether they would or would not put the plaintiff on their tax-free lists, in effect licensing it to make sales to ships in the Port of Philadelphia. But this in reality was simply saying "Yes" or "No". Here the five tobacco companies all said "No". The suspicion which would be created by the unlikelihood of numerous firms reaching one of many possible conclusions is lacking and therefore the unanimity of the tobacco companies' rejections of the plaintiff's applications can afford no substantial basis for an inference of conspiracy. The asserted significance of unanimity of rejection becomes evanescent when one remembers that it is the plaintiff itself which so strongly asserts that to be successful in this type of ship chandlery the chandler must have available for sale all major brands of cigarettes, this assertion being concurred in by most of the defendants.[17] It follows that if each tobacco company knew, as the plaintiff so forcibly asserts, that the others would not supply cigarettes to the plaintiff the sale of one brand of cigarettes to it by one of the tobacco companies would have been a costly and futile gesture. To draw proof of conspiracy from such circumstances is to strain credulity.
 
 
 12
 The fact that the plaintiff offered to buy C.O.D. and that this offer was rejected has no real probative value here. The letters of July 7 and August 21, 1956 do not furnish any substantial indications of the plaintiff's financial responsibility. Even when we consider that matter to which the plaintiff seemingly attaches great importance, viz., complaints to the tobacco companies about Lipschutz and dislike of Lipschutz along the waterfront,[18] we are still of the opinion that the evidence falls short of the minimum necessary to support a finding of conspiracy.
 
 
 13
 To hold to the contrary would be to allow speculation by the jury for we can find no additional circumstances which would tend to cast suspicion on the defendants' rejections of the plaintiff's applications as an exercise of independent judgment. The circumstances of the case at bar afford a striking contrast to those of cases in which findings of conspiracy have been premised on the doctrine of conscious parallelism.[19] The plaintiff contends that the reason given here by the defendant tobacco companies for their refusals to license the plaintiff were false as the District Court implied in Milgram, 192 F.2d 579, at p. 585. But the tobacco companies[20] stated in effect that their representation in the Port of Philadelphia was adequate and that the information disclosed by investigation and the plaintiff's applications did not indicate that it had the experience, financial responsibility and other attributes which would qualify it as a potentially successful distributor. These statements find full support in the record. In 1956, three companies, viz., PM, L&M, and American, with only one outlet did seven-eighths of the total business transacted in the Port of Philadelphia, and each had substantial increases in business over the previous year. Reynolds and Lorillard, although far behind the three leaders, had recently engaged a second distributor and their sales were increasing. Many of the decisions in which courts find conspiracy on the basis of circumstantial evidence do so because the defendants acted in apparent contradiction of their own economic self-interest. In such cases there was evidence that the plaintiff had made a better offer than did those with whom the defendant was currently doing business,[21] or that the plaintiff's place of business was superior to that supplied by the defendant.[22] No better offer was proven here, nor was it shown that the plaintiff could provide facilities equal to those of Lipschutz or Kelly. In William Goldman Theatres, Inc. v. Loew's Inc., 150 F.2d 738 (3 Cir., 1945), cert. denied 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948), one of the defendant distributors had a 100% monopoly on first-run exhibition in Philadelphia. This distributor sought to continue the monopoly, which inured to his benefit. Other distributors cooperated, apparently in return for similar favorable treatment elsewhere.[23] The defendant manufacturers in this case have no interest in the existing agency accounts of Lipschutz or Kelly. Goldman emphasized the fact that the defendants did not place any responsible executives on the stand to rebut the allegation of conspiracy, 150 F.2d 738, at p. 743: there was no silence here. In the Ball case, supra, 169 F.2d 317, at p. 319, the plaintiff introduced evidence that one of the defendant distributors stated that it would use all of its influence to see that other distributors sent their first-run films to the defendant theater, in which it had a 50% interest. The plaintiff offers no evidence of coercion arising from the facts in the instant case. In Milgram this court attached some importance to the decision in United States v. Paramount Pictures, Inc.,[24] involving a conspiracy similar to that which was alleged in Milgram and which had been decided against the defendants, the same persons in fact as were the defendants in the Milgram case. See 192 F.2d 579 at pp. 583-584. The defendants in the case at bar, unlike those in Milgram, do not suffer from the disability of such a prior adverse judgment.
 
 
 14
 Two other factors deserve mention. In the Milgram case, we held that the district court judge was justified in taking into consideration the fact that the eight defendants rejected the plaintiff without giving the matter serious consideration. 192 F.2d 579, at p. 585. The plaintiff urges that the denials were automatic in this case also. This argument is not available against PM, which gave the plaintiff's application thorough consideration. There is no evidence to indicate what attention was accorded the plaintiff's offer in the case of Reynolds and Lorillard, assuming, as we have assumed, that they received O'Keefe's letters.[25] White, the export manager of American, had the issue of licensing the plaintiff under consideration for two days, according to his uncontradicted testimony. The evidence does suggest that L&M's denial was perhaps automatic, but L&M's position in the market strips this of any sinister significance. At the time L&M was selling the large proportion of 42% of the dollar volume in the Port of Philadelphia; in addition, its most recent experience with a sea stores selling agency other than Lipschutz had ended with the bankruptcy of the firm in 1951. Finally, the plaintiff seeks support for a finding of conspiracy in the fact that the defendants had adhered to the policy of rejection in the past. Of course this argument cannot be applied to Reynolds and Lorillard who had in fact accepted a direct account other than Lipschutz. There are only three instances in the record, other than the plaintiff's application, in which at least two of the defendants refused to deal with applicants. L&M and American rejected all three; PM rejected one. As is the case with the rejection of the plaintiff, economic circumstances prevent these denials from serving as bases for inferences of agreement. L&M, American and PM were the three dominant firms in the market, and all were doing very well with Lipschutz at the times of the applications. We do not think that such infrequent action can show conspiracy. On the basis of this record, giving the plaintiff the accumulative benefit of all facts in its favor and of all logical and reasonable inferences to be drawn therefrom, we are forced to conclude that the plaintiff has failed to produce evidence sufficient to support a jury finding of conspiracy.
 
 
 15
 In so deciding, we are not unmindful that the defendants' refusal to deal is as effective in foreclosing the plaintiff from the sea stores tobacco business as an agreement to do so would be. It has been argued that such uniform decisions, made under economic circumstances tending to make the act of one firm or company dependent upon the reaction of others, violate Section 1 even though conspiracy is absent.[26] With this we cannot agree. Section 1 specifies means as well as ends. Perhaps as a matter of public policy restraint of trade per se should be controlled[27] but conspiracy is required in this case.
 
 
 16
 What we have said in respect to the defendant tobacco companies renders it unnecessary to deal with the contentions of Lipschutz Bros., Inc. and of the individual defendants or to discuss the grounds upon which the court below rendered judgment.
 
 
 17
 The judgment will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The plaintiff's original complaint also alleged violation of Section 2 of the Act, 15 U.S.C.A. § 2. Although a pre-trial stipulation and the record of the case seem to indicate that the Section 2 charge has been abandoned, the plaintiff, in a footnote in its brief before this court, still maintains that the monopoly issue is open. Also, the district court opinion states that the suit is brought for violation of both sections. But it is not necessary to resolve this uncertainty for the Section 2 charge as stated is also dependent upon a finding of conspiracy to refuse to deal, which is the controlling issue in the case with regard to the alleged violation of Section 1
 
 
 [2]
 The section states in pertinent part that, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."
 
 
 [3]
 Lorillard has maintained throughout the proceeding that the plaintiff never applied to it to buy cigarettes. The issue of whether an application was made by the plaintiff to Lorillard to purchase cigarettes was considered to be a jury issue by the trial judge and was not decided as will appear. We will assumearguendo that Lorillard was contacted and did refuse to sell cigarettes to the plaintiff.
 
 
 [4]
 In denying these motions the court filed an opinion unreported for publication. It stated in part: "Whether the record contains any evidence to support a finding of a conspiracy or of damages are questions which present more difficulty. Within the time limitations under which I have been working I have been unable to review the record with the care or to examine the law with the thoroughness which I consider necessary for a proper disposition of these questions. I have therefore decided to deny the motions. I do so with the thought that if due consideration of the law and the facts after all of the evidence is in should reveal that plaintiff has failed to make out a case, defendants' rights can be adequately protected either prior to jury submission, or thereafter in the event of a jury verdict adverse to defendants, by curative action by me upon timely and appropriate motions which the Rules authorize defendants to file."
 
 
 [5]
 The first interrogatory was as follows: "Did plaintiff have such business or property as to entitle it to maintain this action?"
 
 
 [6]
 Certain defendants raised individual reasons for the granting of the motion as to each of them but in view of the disposition we make of the case it is unnecessary to set out these reasons
 
 
 [7]
 In its reply brief, the plaintiff urges that the issue of conspiracy is not properly before this court. Various grounds are presented in support of this contention: (1) that the failure of the defendants to cross-appeal bars consideration of the issue; (2) that the defendants flagrantly violated Rule 24 of this court by deliberately presenting an incomplete appendix; i. e. one that does not give all of the evidence in the case which is favorable to the plaintiff; (3) that the defendants have violated Rule 24 also by failing to provide a precise chronological statement of the facts necessary to decide the conspiracy issue; and (4) that this court will not rule on an issue which has not been decided by the district court. The plaintiff's objections (1) and (4) must be rejected on the basis of the Supreme Court'sper curiam opinion in Jaffke v. Dunham, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957), the relevant language of which has been recognized and applied in this circuit, Zegan v. Central R.R. Co., 3 Cir., 266 F.2d 101, 103, 77 A.L.R.2d 768 (1959). In Jaffke, 352 U.S. at 280-281, 77 S.Ct. at 308, the Court stated: "We granted certiorari in this case to review a judgment of the Court of Appeals * * * reversing an order of the District Court * * * sitting in bankruptcy, which required respondent as trustee of a bankrupt's estate to pay $27,400 to petitioner. * * * On appeal, the Court of Appeals held that petitioner had failed to prove that any specific portion of the money that he had given the bankrupt became a part of the funds in the hands of respondent. Because petitioner had not cross-appealed, the Court of Appeals held that it could not consider the action of the District Court in striking the bankrupt's affidavit from the record. A successful party in the District Court may sustain its judgment on any ground that finds support in the record. If the District Court was in error in striking an admissible affidavit, a cross-appeal was not a perequisite for the Court of Appeals to rule on the admissibility of the affidavit, and finding it admissible to find that it afforded evidence in support of the District Court judgment." In the Zegan case, this court applied the Jaffke rule in an appeal from a judgment for defendant under Federal Rule of Civil Procedure 50 (b) and considered an argument not passed on by the court below — precisely the situation presented by the instant appeal.
 In respect to objections (2) and (3), although the defendants do not ignore all of the plaintiff's evidence, it is true that the statement of facts and the appendix do omit some of the testimony offered by the plaintiff which would tend to show the tobacco companies to have been interested in and aware of what their competitors were doing in respect to applications for direct listing. The defendants' appendix also neglected to include evidence relating to earlier rejections by the tobacco companies of applications for direct listings. The court had the possibility of omissions like these in mind when it provided for a reply brief and appendix. See our Rule 24(5). By this rule the adversary party can make sure that there is brought to the attention of the court all evidence deemed pertinent. The plaintiff has taken full advantage of this opportunity in the case a bar. We think we should not bar consideration of the defendants' motions to dismiss the action on the ground that the evidence is insufficient to sustain the charge of conspiracy. No prejudice has resulted to the plaintiff from the defendants' insufficient reproduction of the record in their appendix.
 
 
 [8]
 We have called these "motion[s] for a directed verdict". Technically they are motions to enter judgment for the respective defendants pursuant to Rule 50 (b)
 
 
 [9]
 See Rahl, Conspiracy and the Anti-Trust Laws, 44 Ill.L.Rev. 743, 757 (1950)
 
 
 [10]
 Ball v. Paramount Pictures, Inc., 169 F.2d 317, 319 (3 Cir., 1948), cert. denied 339 U.S. 911, 70 S.Ct. 568, 94 L.Ed. 1337 (1950)
 
 
 [11]
 Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). See Note, Conscious Parallelism — Fact or Fancy? 3 Stanford L.Rev. 679 (1951)
 
 
 [12]
 Report of the Attorney General's National Committee to Study the Antitrust Laws 39-40 (1955)
 
 
 [13]
 Cf. Federal Trade Commission v. Cement Institute, 333 U.S. 683, 713 n. 15, 68 S.Ct. 793, 92 L.Ed. 1009 (1948)
 
 
 [14]
 The persons who created the plaintiff and were its principal stockholders were Mr. O'Keefe, Walter E. Knecht, Jr., Esquire, Mr. O'Keefe's law partner, Mr. Edward J. Conway, Chief Deputy United States Marshal for the Eastern District of Pennsylvania, Mr. H. Lawrence Clark, a Deputy United States Marshal, Eastern District of Pennsylvania, and Mrs. Mary Jane Hoffman, a school teacher of Cape May, New Jersey
 
 
 [15]
 The defendants rely on Independent Iron Works, Inc. v. United States Steel Corp., 177 F.Supp. 743, 746 (D.C.N.D. Cal.1959). The court stated: "In deciding whether evidence of defendants' conduct can reasonably support an inference of conspiracy, there must be more than mere general similarities; there must be a sameness of conduct under circumstances which logically suggest joint agreement, as distinguished from individual action." But the court did not say that parallelism in detail was asine qua non of a plaintiff's case; it went on to note that there was no other circumstantial evidence pointing to conspiracy. If a contrary interpretation of the court's holding is to be drawn from the statement at p. 749, that "as soon as generalities are put aside, the many divergencies in the defendants' practices show such a lack of `parallel conduct' as to negate any inference of agreement", we decline to follow it.
 
 
 [16]
 The plaintiff's representatives, O'Keefe and Clark, had interviews in 1957 with Philip Morris's representatives but not with those of the other tobacco companies
 
 
 [17]
 Lorillard was not asked the question as to whether or not all brands of cigarettes were required for successful selling of the sort contemplated by the plaintiff. American made it clear that it "had no objection to" the distributor selling all brands
 
 
 [18]
 The record discloses but two instances of complaints by buyers. Both were brought to the attention of L&M by a competitor of Lipschutz. The testimony is undisputed that an explanation satisfactory to L&M was given to L&M by Lipschutz. There is also a showing that PM had information that other ship chandleries on the waterfront disliked Lipschutz and that PM's waterfront representative did not feel that Lipschutz was giving to selling PM brands an effort equal to that given by Lipschutz to selling some other brands. If this be evidence which demonstrates unreasonableness in PM's refusal to sell to the plaintiff there was none of a similar nature introduced against the other tobacco companies who dealt only with Lipschutz. The charge laid in the complaint is conspiracy under Section 1 of the Sherman Act. The evidence just referred to goes only to PM's refusal to sell to the plaintiff and cannot support the conspiracy charge
 
 
 [19]
 Milgram v. Loew's, Inc., 192 F.2d 579 (3 Cir. 1951), cert. denied 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952); Bordonaro Brothers Theatres, Inc. v. Paramount Pictures, Inc., 176 F.2d 594 (2 Cir. 1949); Ball v. Paramount Pictures, Inc., 169 F.2d 317 (3 Cir. 1948), cert. denied 339 U.S. 911, 70 S.Ct. 568, 94 L.Ed. 1337 (1950); William Goldman Theatres, Inc. v. Loew's, Inc., 150 F.2d 738 (3 Cir. 1945), cert. denied 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948); see Givens, Parallel Business Conduct under the Sherman Act, 5 Antitrust Bull. 273, 279 (1960). In other cases utilizing the theory of conscious parallelism to find conspiracy, at least two of the following three circumstances are present: "plus" factors such as those emphasized in the simple refusal to deal cases, supra; parallelism of a much more elaborate and complex nature; a web of circumstantial evidence pointing very convincingly to the ultimate fact of agreement. With the above cited cases compare United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); F. T. C. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1009 (1948); United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Pittsburg Plate Glass Co. v. United States, 260 F.2d 397 (4 Cir., 1958), aff'd 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); Morton Salt Co. v. United States, 235 F.2d 573 (10 Cir. 1956); C-O-Two Fire Equipment Co. v. United States, 197 F.2d 489 (9 Cir.), cert. denied 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952); Homewood Theatre, Inc. v. Loew's, Inc., 110 F.Supp. 398 (D.C.Minn.1952)
 
 
 [20]
 That is to say, all the tobacco companies, save Lorillard. There is no evidence as to why Lorillard refused to sell to the plaintiff but cf. note 3, supra
 
 
 [21]
 E. g., Ball v. Paramount Pictures, Inc., 169 F.2d 317, 319 (3 Cir. 1948), cert. denied 339 U.S. 911, 70 S.Ct. 568, 94 L. Ed. 1337 (1950)
 
 
 [22]
 E. g., Bordonaro Brothers Theatres, Inc. v. Paramount Pictures, Inc., 176 F. 2d 594, 597 (2 Cir. 1949). Compare Brown v. Western Massachusetts Theatres, Inc., 288 F.2d 302, 304-305 (1 Cir., 1961)
 
 
 [23]
 See Milgram v. Loew's Inc., 192 F.2d 579, 585 (3 Cir. 1951), cert. denied 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952)
 
 
 [24]
 66 F.Supp. 323 (D.C.S.D.N.Y.1946), modified 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), on remand 85 F. Supp. 881 (D.C.S.D.N.Y.1949)
 
 
 [25]
 The Reynolds' contact with the plaintiff through its local representative, Comey, was not "automatic" in nature. The record shows that the meeting lasted approximately 45 minutes, and that Comey gave O'Keefe a full hearing
 
 
 [26]
 See Conant, Consciously Parallel Action in Restraint of Trade, 38 Minn.L. Rev. 797, 814-25 (1954)
 
 
 [27]
 See Rahl, supra, note 9, at pp. 759-62; Schwartz, New Approaches to the Control of Oligopoly, 109 U.Pa.L.Rev. 31 (1960), especially pp. 39-41. Cf. the English imposition of direct control of oligopolistic restraint of competition, regardless of the means of restraint, Monoplies and Restrictive Practices (Inquiry and Control) Act, 1948, 11 & 12 Geo. 6, ch. 66, §§ 3(2), 4(2)