James A. PHILLIPS, Jr.

v.

**WINTERS' CLEANERS AND TAILORS, INC., et al.**

**Civ. A. No. 69–2946.**

United States District Court,
E. D. Pennsylvania.

June 29, 1972.

Raymond T. Cullen, Jr., Philadelphia, Pa., for plaintiff.

R. David Bradley, Philadelphia, Pa., for defendant Winters' Cleaners.

John F. McNulty, Philadelphia, Pa., for defendant Rossi.

## OPINION

LUONGO, District Judge.

Plaintiff, James A. Phillips, Jr., was injured when he sustained an electric shock while on the premises of Winters' Cleaners and Tailors, Inc. (Winters' Cleaners) plant on January 3, 1968. Plaintiff is the inventor of the Steam Kat, a patented water heating device for use in commercial laundries. At the time he sustained the injury, plaintiff was an officer and principal of the Steam Kat Corporation, manufacturer of the device. Sometime prior to the date of the accident, Winters' Cleaners had purchased a

Steam Kat from Wendale Corporation, trading as Best Equipment Company (Best Equipment). Winters' Cleaners had on its premises other machinery and equipment, including a vacuum pump manufactured by Rema Corporation. Approximately two months before the accident, Winters' Cleaners had had some electrical work done on its premises by Donald A. Rossi, individually and trading as G. J. Rossi and Son, to correct deficiencies noted in certain violation notices issued by the City of Philadelphia.

Just short of two years after the accident, plaintiff instituted suit against Winters' Cleaners, the occupier of the premises; Best Equipment, supplier of the Steam Kat; Rema Corporation, supplier of the vacuum pump; and Rossi, the electrical contractor. The matter came on for trial (confined initially to liability) before a jury on January 17 and 18, 1972. At the outset, plaintiff's counsel announced that he would not seek recovery against Rema Corporation, but because of cross-claims among the defendants, the case as to Rema could not then be dismissed. At the close of plaintiff's evidence, all defendants filed motions for directed verdict under Rule 50. Plaintiff did not oppose the motions of Rema and Best Equipment, and after cross-claims by and against those defendants had been withdrawn, their motions were granted. Plaintiff did oppose the Rule 50 motions of Winters' Cleaners and Rossi. After argument, and after the remaining cross-claims between and among the defendants had been withdrawn, Rossi's motion for directed verdict was granted, but Winters' Cleaners' was denied. Winters' Cleaners offered no evidence. The case was then submitted to the jury which returned a verdict in favor of the only remaining defendant, Winters' Cleaners.

Before the court now are plaintiff's

A. Motion for Judgment against Winters' Cleaners Notwithstanding the Verdict in the latter's favor, or in the Alternative, for New Trial as to Winters' Cleaners; and

B. Motion to Vacate Judgment entered in favor of Rossi and for New Trial as to Rossi.

The grounds for the motions are:

(1) the court erred in submitting to the jury the question whether plaintiff, while on Winters' Cleaners' premises, was there as a business invitee or a licensee;

(2) the court erred in denying plaintiff's motion for directed verdict against Winters' Cleaners;

(3) the jury's verdict in favor of Winters' Cleaners is against the clear weight of the evidence;

(4) various errors in the court's charge and rulings at trial; and

(5) the court erred in granting Rossi's motion for directed verdict.

The motions will be denied.

*Factual Background*

In 1967, Best Equipment sold a Steam Kat to Winters' Cleaners. On January 3, 1968, plaintiff, whose duties with the Steam Kat Corporation included sales and promotional work, made a call at the Winters' Cleaners plant at the request of William Becker, a representative of Best Equipment. While there, Phillips asked for and obtained from Robert Winters, production manager and part owner of Winters' Cleaners, permission to look at the laundry and dry cleaning equipment in the basement. The evidence is not at all clear whether the visit to the basement was to enable Phillips to check the controls on the Steam Kat because of a complaint that the water was too hot; or to enable Phillips to take pictures of the Steam Kat and other equipment for his promotional purposes; or to enable Phillips to see an unusual drainage system hookup. In any event, plaintiff, Becker and Winters went to the basement. Plaintiff bent over to look at certain controls on the Steam Kat, with one hand on an aquastat attached to the Steam Kat. He turned to speak to Becker and Winters, or both, and to steady himself, he placed his other hand on a copper condensate drain pipe con-

nected to the Rema vacuum pump. At that point plaintiff received an electric shock, became frozen to the equipment, and remained so until he was freed by Becker. Shortly after the accident, defendant Rossi, whose place of business was located nearby, responded to a telephone call, checked the equipment and ascertained that a pipe (not specifically identified) attached to the Rema pump was electrically energized. He cut off the power to the Rema pump as a temporary measure. Later, the equipment was checked more thoroughly and it was then found that the plate on the switch box to the Rema pump was loose.

In the preceding October or November (some 2 or 3 months prior to the accident), after receipt of violation notices from the City of Philadelphia, Winters' Cleaners had hired Rossi, an independent electrical contractor, to perform the work necessary to correct the electrical violations. The work was apparently done [1] to the satisfaction of the City and was completed sometime prior to November 6, 1967, the date Rossi's bill was submitted to Winters' Cleaners. One of the items of work performed by Rossi was the installation of an electrical connection in the Rema pump. All such electrical work is required by the Philadelphia Electrical Code to be properly grounded. There was uncontradicted expert testimony offered by plaintiff that it is impossible to get an electric shock from electrical equipment which is properly grounded.

Some of plaintiff's evidence was presented by calling adverse parties as witnesses, e. g. Donald Rossi and Robert Winters. Plaintiff elicited from Rossi testimony to the effect that Rossi had received a telephone call from one of the Winters brothers approximately one week prior to the date of Phillips' accident advising that they were having some trouble with the Rema pump and asking Rossi to stop in to check it. Rossi did not stop in during the week or so between the time of the call and the date of the accident. In the cross-examination of Rossi by Winters' Cleaners' attorney, Rossi was asked whether he had been told in that telephone call from Winters that they were experiencing electric shocks. Rossi testified that he did not believe that anything had been said at that time about electric shocks because, if electric shocks had been mentioned, he "definitely" would have visited the premises promptly and would not have waited a week before responding to the call.

Robert Winters was also called as plaintiff's witness. On cross-examination by his own counsel, he was asked one question to which he responded as follows:

"Q. I have just one question at this point. When you walked down the cellar with Mr. Phillips, the plaintiff, did you ever have an inkling that there was anything wrong with that Rema unit?

"A. No."

## DISCUSSION

The various grounds assigned by plaintiff in support of his motion will be discussed seriatim.

1. *The Court erred in submitting to the jury the issue of plaintiff's status.*

It is plaintiff's contention that the record supports only one conclusion, i. e. that plaintiff was a business invitee, and that the court should have declared plaintiff's status as such as a matter of law and should not have submitted to the jury the question whether plaintiff was a business invitee or a licensee.

▆ A business invitee is one who is invited or permitted to enter or remain on the premises of another for a purpose directly or indirectly connected with business dealings between them. Argo v. Goodstein, 438 Pa. 468, 265 A.2d 783 (1970). A licensee is one who is privileged to enter or remain on premises only by virtue of the possessor's con-

---

1. Rossi testified, without objection from plaintiff, that his work was approved by the City. (N.T. 75)

# 1044

sent. Farrell v. Boner, 424 Pa. 301, 227 A.2d 683 (1967).

■■■■ A possessor of land owes a somewhat higher duty to a business invitee than to a licensee. To a business invitee, the possessor owes the duty to exercise reasonable care to make the premises safe for him, or to warn of dangers which are known to the possessor or which the possessor should have became aware of in the exercise of reasonable care, and which are unknown to the invitee. Stark v. Lehigh Foundries, 388 Pa. 1, 130 A.2d 123 (1957); Argo v. Goodstein, *supra*. To a licensee, on the other hand, the possessor of land owes the duty to warn of a dangerous condition only if the possessor has knowledge of it and realizes that the condition involves an unreasonable risk of harm to the licensee and that the licensee is not likely to discover its existence. Davies v. McDowell Nat. Bank, 407 Pa. 209, 180 A.2d 21 (1962).

■■■ The difference between the duty owed to a business invitee and to a licensee lies in the possessor's duty to the business invitee to exercise reasonable care, both to make the premises safe, and to discover and make known dangers which a reasonable inspection would disclose. Essentially, the difference boils down to the duty to inspect.

At the outset, it should be pointed out that the court was not free from doubt as to whether plaintiff's status should have been declared, as a matter of law, to be that of a business invitee. It was finally determined, in an excess of caution, to submit the issue to the jury to decide (see N.T. 157). In the view which I take of this case, however, the question of status is not significant. As noted above, the duty owed to business invitee and licensee differs essentially in the duty to inspect. Consequently, unless there is a basis for a finding of breach of duty for failure to make known that which a reasonable inspection of the premises would have disclosed, the question of status was inconsequential and the error, if any, in submitting the issue of status to the jury was harmless.

Whether there was a basis for finding that defendant had breached a duty to inspect, depends, in turn, on which party had the burden of proof. Counsel for plaintiff conceded at oral argument on these motions that he had not offered any evidence as to what would have constituted a reasonable inspection and what such reasonable inspection would have disclosed. If it was plaintiff's burden to adduce such evidence, there was a failure of proof on that score, leaving as the sole basis of liability, defendant's failure to warn of a condition of which it had knowledge, as opposed to that which reasonable inspection would have disclosed.

Plaintiff has cited two cases which he contends establish the proposition that it is defendant's burden to come forward with evidence as to reasonable inspection. The cases are Schell v. Miller North Broad Storage Co., Inc., 157 Pa.Super. 101, 42 A.2d 180 (1944), aff'd per curiam, 353 Pa. 319, 45 A.2d 53 (1946), and Skeen v. Stanley Co. of America, 362 Pa. 174, 66 A.2d 774 (1949). The *Schell* case involved a bailment contract which provided

> "The bailee shall be responsible for exercise of ordinary diligence and care in . . . storage . . . but not liable for loss or damage occasioned by . . . fire . . . ."

Plaintiff presented evidence that a fire had occurred and that the fire had spread, by reason of the failure of certain automatic devices to shut fire doors between floors, to the floor where plaintiff's goods were stored. The court noted that the bailee was obliged to exercise ordinary care, not only to prevent fire from starting but also to arrest its progress, but went on to state, 157 Pa.Super. at page 104, 42 A.2d at page 182:

> "The burden of proof rested upon [bailor] which could be satisfied by showing, not only that he had stored his goods in [bailee's] warehouse and that they had not been returned to him, but that they had been lost and destroyed by a fire which was due to [bailee's] negligence."

The bailee in that case sought to defend on the ground that it had discharged its obligation by installing the automatic devices on the fire doors. It was in the assertion of that defense that the Superior Court noted that the defendant had the burden to establish that it had made reasonable inspection of the automatic devices to be sure that they were in operating condition.

In the *Skeen* case, a bolt fell from the ceiling of defendant's movie theatre and struck a patron on the arm. The court there held that, in the absence of exculpatory evidence by the defendant, the falling of the bolt supported an inference of negligence which required submission of the case to the jury. It therefore reversed the trial court's action in granting judgment for defendant as a matter of law. The rationale for the court's ruling in *Skeen* was that

"[I]t is reasonable to infer that the bolt was attached to some equipment in the theatre. The rebuttal of this natural inference was a duty the circumstances cast upon the defendant. For the absolving of the defendant from legal responsibility for an injury caused by the fall of this bolt on one of its patrons, it is only fair to call upon the defendant to show that it exercised due care to prevent harm to its patrons." 362 Pa. pages 176–177, 66 A.2d page 775.

The cases cited in *Skeen* in support of that proposition (Durning v. Hyman, 286 Pa. 376, 133 A. 568 (1926); Shafer v. Lacock, Hawthorn & Co., 168 Pa. 497, 32 A. 44 (1895); Gable v. Golder, 116 Pa. Super. 415, 176 A. 847 (1935)) are all based on the doctrine of exclusive control. The Supreme Court of Pennsylvania has ruled that

" . . . doctrine should be applied only where *all* of the following elements are present: (a) where the thing which caused the accident is under the exclusive control of or was made or manufactured by the defendant; *and* (b) the accident or injury would ordinarily not happen if the defendant exercised due care, or made or manufactured the article with due care; *and* (c) where the evidence of the cause of the injury or accident is not equally available to both parties, but is exclusively accessible to and within the possession of the defendant; *and* (d) the accident itself is very unusual or exceptional and the likelihood of harm to plaintiff or one of his class could reasonably have been foreseen and prevented by the exercise of due care; *and* (e) the general principles of negligence have not theretofore been applied to such facts." Izzi v. Phila. Trans. Co., 412 Pa. 559, 566, 195 A.2d 784 (1963). (Emphasis in original.)

In the instant case the exclusive control doctrine is unavailable to plaintiff because, at the very least, he failed to prove that "the thing which caused the accident [was] under the exclusive control of the defendant." It was abundantly clear from the evidence that Rossi and other independent electrical contractors had performed work on Winters' Cleaners' equipment and presumably had had access to the Rema pump in the course of such work (see N.T. 90). This is similar to the situation which confronted the court in Githens, Rexsamer & Co., Inc. v. Wildstein, 428 Pa. 201, 236 A.2d 792 (1968) in which a fire, allegedly caused by a defective refrigerator motor, caused damage to an adjoining building owned by plaintiff. The trial judge charged the jury that the doctrine of exclusive control applied and cast upon the defendants the burden of producing evidence of due care. In holding that the doctrine had no application in that case, the Supreme Court, quoting from the opinion of the court en banc below stated, at page 207, 236 A.2d at page 796:

" 'The thing' which plaintiff contends caused the accident is the motor, which was allegedly improperly fused. This motor and the electrical system in question had been installed and maintained by Penn Jersey, an independent contractor selected by defendants. While this fact would not exonerate defendants from their duties as owners and occupants of the premises, it did nega-

tive the existence of the requirement that 'the thing' which caused the accident be in defendants' exclusive control."

It can readily be seen that a paraphrase of the foregoing quote would describe the instant case and would likewise negative the essential finding of exclusive control.

██ Since plaintiff's case did not come within the exception of the exclusive control doctrine, the burden of proof remained with him. In light of his failure to prove what would have constituted a reasonable inspection and what such inspection would have disclosed, breach of duty of reasonable inspection was eliminated as a possible basis for liability, leaving, as the sole ground for liability, defendant's failure to warn of a dangerous condition of which it had knowledge, actual or constructive. On this ground, defendant's duty to a business invitee and to a licensee, as previously noted, is the same, consequently the error, if any, in submitting plaintiff's status to the jury was harmless.

2. *The Court erred in denying plaintiff's motion for directed verdict against Winters' Cleaners.*

██ Plaintiff contends that the evidence in the case leads to only one conclusion, that Winters' Cleaners had knowledge, actual or constructive, of the dangerous condition and the court should have granted his motion for directed verdict.

The argument is a two pronged one. The first prong is that the evidence discloses, without question, that Winters' Cleaners had actual knowledge of the defective and dangerous condition of the Rema pump, and the second prong is that the condition was one as to which Winters' Cleaners was chargeable with knowledge as a matter of law.

The test to be applied in directing a verdict for plaintiff is set forth in Mihalchak v. American Dredging Company, 266 F.2d 875, 877 (3d Cir. 1959):

" . . . The question raised by plaintiff's motion for a directed verdict, then, is whether he had so well succeeded in carrying his burden of producing evidence that he was entitled to a verdict in his favor as a matter of law.

"The propriety of directing a verdict in appropriate situations in favor of the party imposed initially with the risk of non-production of evidence seems to be well settled. Yet though a motion for directed verdict in favor of the proponent of an issue is cast in the same form as when made by the defending party, it requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding. The ultimate conclusion that there is no genuine issue of fact depends not on a failure to prove at least enough so that the controverted fact can be inferred, but rather depends on making impossible any other equally strong inferences once the fact in issue is at least inferable."

The evidence as to defendant's knowledge in the instant case was far from overwhelming. There was some testimony suggesting that Winters' Cleaners had knowledge that the Rema pump was energized,[2] but there was also testimony supporting a finding of lack of knowledge, or which at least impeached the evidence of knowledge.[3] In this state

2. There was an intimation that in a pretrial deposition Rossi had stated that Winters' Cleaners had telephoned about a week bfore the accident complaining of trouble with the pump and that they were experiencing shocks.

3. Rossi's testimony at trial recanting, or at least questioning the accuracy of, whatever testimony he had given at the pretrial deposition concerning complaints of electric shocks prior to the date of accident.

of the evidence, it could not be said that the only possible inference was that Winters' Cleaners had actual knowledge of the dangerous condition. Accordingly, the denial of plaintiff's motion for directed verdict was proper.

The other prong of plaintiff's argument that his motion for directed verdict should have been granted is that the defendant, Winters' Cleaners, was chargeable with knowledge, as a matter of law, of the defect by the mere existence of the electrical hazard at its plant. For this proposition plaintiff relies on Pastuszek v. Murphy Plywood Corp., 219 Pa.Super. 59, 280 A.2d 644 (1971) and Johnson v. Rulon, 363 Pa. 585, 70 A.2d 325 (1950).

In *Pastuszek,* plaintiff was a patron in a warehouse in which defendant leased space. At defendant's invitation, plaintiff inspected and counted sheets of plywood. While so occupied, he fell into a manhole which was not securely covered and whose location was "half lit." The manhole was located in an aisleway between the area leased by defendant and an area leased by another dealer. The trial court directed a verdict in favor of defendant on the ground, inter alia, that a prima facie case of negligence had not been made out by plaintiff. The Superior Court reversed, holding that the evidence warranted an inference of negligence. The court pointed out that, in order to show a breach of duty by defendant, it was necessary to show notice of the defect. It held, relying on Johnson v. Rulon, *supra,* that the mere existence of a potential hazard such as the one there involved constituted at least constructive notice of the defect. In Johnson v. Rulon, plaintiff entered a restaurant for lunch. As he turned to hang up his coat, and while his attention was directed to signs on the wall specifying foods and prices for the day, he fell into an open trap door located in the floor between the lunch counter and individual booths. The Supreme Court reversed the trial court's grant of a compulsory nonsuit and stated (referring to an open hole in a passageway), at page 588, 70 A.2d at page 327:

"A condition of 'so pronounced a character' is sufficient to carry a case to the jury on the question of the owner's . . . negligence. So far as knowledge of the dangerous condition is important, the owner had such in the present instance. The mere existence of a trap door in a floor intended to be trodden by business invitees was, of itself, sufficient to charge the owner of the business with knowledge of the potential danger inherent in even an occasional use of the trap door *during business hours.* But, inferentially at least (and the plaintiff is entitled to the inference), the defendant had actual knowledge of the existing dangerous condition. Either he or an authorized employee was present in the restaurant while the trap door was open and the opening unguarded . . . ." (Emphasis in original.)

*Johnson* and *Pastuszek* are clearly distinguishable from the instant case and their holdings are not controlling here. In both *Johnson* and *Pastuszek* the obviousness of the conditions located in passageways intended for use by patrons whose attention could reasonably be expected to be diverted, permitted at least an inference of constructive notice to the owner or occupier of the defects existing in the passageways. In the instant case the machines were located in the basement, a place patrons would not normally be expected to be present, and the condition was neither obvious nor readily observable. The defect was latent, discoverable only, so far as the evidence shows by touching the energized equipment and experiencing an electric shock. There was no basis, therefore, for an inference of constructive notice of the defect, let alone basis for declaring that constructive notice had been established as a matter of law.

**1048**

### 3. *The verdict is against the weight of the evidence.*

█ Plaintiff contends that he is entitled to a new trial because the verdict is against the clear weight of the evidence. The summary of the evidence under the heading "Factual Background" and the further discussion of the evidence in the portion of this opinion disposing of plaintiff's contention that he was entitled to a directed verdict reveals the inadequacy of plaintiff's evidence and leads ineluctably to the conclusion that there is substantial support for the jury's verdict in favor of the defendant, Winters' Cleaners.

### 4. *Errors in the charge and rulings. at trial.*

Various portions of the charge are now complained of, but only three portions assigned as erroneous will be discussed because of plaintiff's failure, as to the other alleged errors, to comply with the requirements of Rule 51, F.R.C.P.[4]

█ (a) Plaintiff charges that the court erred in denying his request to charge the jury (Plaintiff's Supplemental Points for Charge No. 22):

"If you find from the preponderance of evidence in the case that the defendant by some act or failure to act violated the provisions of the Philadelphia Electrical Code, such conduct in violation of the law is presumed negligent. Such a finding of negligence, based upon a violation of law by defendant will justify a verdict in favor of plaintiff if the violation of law was a proximate cause of plaintiff's injury."

At the conclusion of the charge, the matter was raised and disposed of as follows: (N.T. 178)

"MR. CULLEN: Your Honor, I take it you are denying my supplemental point 22.

4. Rule 51, F.R.C.P. provides, in pertinent part:
"Rule 51. Instructions to Jury: Objection
&ast; &ast; &ast; &ast; &ast;
No party may assign as error the giving or the failure to give an instruction

"THE COURT: Yes. I am not aware of any evidence of violations of the Code."

Counsel did not then bring to the court's attention any such evidence, and he has not since pointed out any such evidence, either in his brief or in oral argument.

█ (b) The court erred in charging that if the jury found certain facts to have been established, the jury "may" conclude that plaintiff had been impliedly invited to enter defendant's premises and "could" conclude that he was a business visitor.

After giving some general instructions to the jury as to what the law regards as a business invitee and the duty owed to such invitee, the court then proceeded to discuss those general principles in light of the facts in the case before the jury, as follows: (N.T. 169-171)

"So much for a general statement of the law, and now we come to this particular case. You will recall that the plaintiff here, James A. Phillips, Jr., is the inventor of a particular procedure for heating water in connection with the laundry business. He is one of the prime movers in a company that markets this equipment. The defendant . . . through . . . the Wendale Corporation . . . purchased one of Mr. Phillips' company's products . . . and it was installed on the defendant's premises.

"At some point one of the principals of the Winters' company informed Mr. Becker that they were having some problems concerning the degree of heat in the water to go into this unit and asked that he stop around. Mr. Becker was the representative of the Wendale Corporation, and Mr. Becker, as I recall, testified that he then communicated with Mr. Philips and said to him,

unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

'The next time you are in the area will you stop by. We have several places I would like to visit, and we will pay some courtesy calls,' and I don't remember whether he testified expressly to this effect, but presumably then he would take care of whatever minor complaints and adjustments any of the customers might have had.

"Members of the jury, if you find that that was the background of the visit by Mr. Phillips to the premises of Winters' Cleaners and Tailors, Incorporated, and if you find that Mr. Robert Winters, one of the . . . officers of the defendant company, was there when he arrived, you *may* conclude that there was an invitation, an implied invitation, for Mr. Phillips, as a representative of the manufacturer of the Steam Kat, to be upon those premises and to examine the unit to make whatever adjustments might be necessary; and if you find that he was such a business visitor, if you find that he was there in connection with the business of Mr. Phillips' company or if you find that he was there in connection with the business of Winters' Cleaners, or if you find that he was there in connection with the business of both, under any one of those three circumstances, you *could* conclude that Mr. Phillips was there as a business visitor; and as a business visitor, as I have indicated to you, he was entitled to be warned about dangers that were not readily apparent to him and which the defendant was aware of or in the exercise of reasonable care should have learned about." (Emphasis added.)

The word "may" was properly used to indicate that it was entirely within the jury's province to determine whether to draw the inference that, under the circumstances, an implied invitation had been extended to plaintiff to be upon defendant's premises. The word "could" was used to indicate that any one of the three preceding circumstances referred to would warrant the jury in finding that plaintiff was there as a visitor. While,

semantically, it would have been more accurate to tell the jury that the existence of any one of those three circumstances *required* a finding that plaintiff was a business visitor, I am convinced that the jury was not at all misled by the charge, viewing it as a whole.

(c) The court erred in refusing to give binding instructions declaring plaintiff's status to be that of a business invitee.

As noted before (see discussion under No. 1, supra) if it was error to submit this issue to the jury, the error was harmless, consequently no purpose would be served by an extended discussion whether plaintiff's status should have been determined, as a matter of law, by the court.

(d) Trial rulings.

 Plaintiff complains also of several trial rulings, only one of which merits mention. A hypothetical question which plaintiff's counsel posed to his expert witness, and what transpired in connection therewith, is set forth in full. (N.T. 135–136)

"BY MR. CULLEN:

Q. Now, Mr. Duff, I ask you to assume, if you will, that the following is true: that an electrically operated vacuum pump had attached to it a copper condensate drain line and that drain line is touched by a person who at the same time is touching another metallic object and that person thereupon receives from one of those sources an electrical shock; and the device, the switch, which carries current, if any, to the second device being touched is turned off. Does that indicate to you that the machine to which the copper drain line is attached is not grounded?

"MR. BRADLEY: Objection.

"THE COURT: I think that you might want to take a few minutes to work out your hypothetical question. I will sustain the objection. It is entirely too confusing in its present form. You are referring to another machine. Take a few minutes and write it down.

"BY MR. CULLEN:

Q. Mr. Duff, let me ask this question first: Assume, if you will, that a person brushes against a piece of metal tubing attached to an electrically operated vacuum pump and receives a shock. In your opinion, can that pump be properly grounded?

\*　\*　\*　\*　\*　\*

A. No. He would have to have fault current on it from some place. It would probably be the motor.

MR. CULLEN: I have no further questions, your Honor."

In light of the last question and answer, to which no objection was made, it is quite understandable why plaintiff's counsel made no attempt to pose another hypothetical question. He already had in the record all he could hope to get from the expert.

5. *The Court erred in granting Rossi's motion for directed verdict.*

 Plaintiff contends that he made out a prima facie case of negligence against Rossi and Rossi's motion for directed verdict should have been denied.

On a defendant's motion for a directed verdict the evidence must, of course, be considered in the light most favorable to the plaintiff and with the benefit of all inferences which can reasonably be drawn in his behalf. Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199 (3d Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). So viewed, the evidence in this case fell far short.

Plaintiff presented expert testimony that it is impossible to get an electric shock from equipment which is properly grounded. He established that he experienced a shock when he touched a pipe connected to the Rema pump. He also established that, two or three months before the accident, Rossi had installed a switch on the Rema pump in the course of correcting electrical deficiencies which were the subject of violation notices issued by the City of Philadelphia to Winters' Cleaners. Plaintiff's evidence also showed, however, that the electrical work which Rossi did was approved by the City and, presumably therefore, conformed to the requirements of the Electrical Code, including those pertaining to grounding.

In view of the lapse of time between the date of Rossi's performance of the work and the date of the accident, and the further circumstance that Rossi was not in control of the premises or the equipment during that time, and in view of the total absence of evidence as to any specific defect in the work, the jury could only have found an inference of negligence against Rossi by resort to speculation and conjecture. Plaintiff's expert succeeded in supplying a cause of the accident (improper grounding of a piece of electrical equipment), but the shortcoming in plaintiff's case was that he failed to establish responsibility for the cause.

Plaintiff's motion for new trial as to defendant Rossi will be denied.